# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN
_____

**MICHAEL MERRILL et al.,**

                             **Plaintiffs,**

**v.**                                                 **Case No. 10-cv-700**

**BRIGGS & STRATTON CORP. et al.,**

                             **Defendants.**
_____

## DECISION AND ORDER

Plaintiffs Michael Merrill, Gregory Weber and Jeffrey Carpenter, retired employees of defendant Briggs & Stratton Corporation ("Briggs"), and plaintiffs' union, brought this class action suit against Briggs and its Group Insurance Plan under § 301 of the Labor Management Relations Act ("LMRA") and § 502(a) of the Employee Retirement Income Security Act ("ERISA") alleging that defendants violated the parties' collective bargaining agreement ("CBA") by reducing health benefits of employees who retired before August 1, 2006. Before me now are cross-motions for summary judgment as well as several motions related to the parties' expert witnesses.

## I. Background

Since at least 1983, Briggs has negotiated with the union representing employees at its Milwaukee manufacturing facilities. Briggs and the union agreed that Briggs would provide health benefits to retirees, and these agreements have been memorialized in a series of CBAs. The parties have a long and complex bargaining history, but generally speaking, before August 1, 2006, CBAs provided certain retirees with fully-paid health

benefits for a certain duration of time.[1] In 2005, however, when the parties were negotiating a renewed CBA to take effect in 2006, Briggs proposed language changing all retiree coverage to be "the same coverage(s) offered active employees." App. Part 3 of 5 at 81 (ECF No. 125-3). The parties negotiated, and the final language agreed on was: "for employees who retired on or after 8-1-06, coverages . . . shall be the same coverage(s) offered active employees and are subject to change." Eisenberg Decl. Ex. Q at 107 (ECF No. 119-17).

Then, in 2010, Briggs notified all retirees that it had made unilateral changes to their health benefits, including the introduction of a $12,000 cap on company contributions for individual coverage and a $24,000 cap for family coverage, the elimination of some retiree plans, and switching employees exclusively to PPO plans.[2] Subsequent changes in 2011, 2012, and 2013 have allegedly further reduced the number of plan options, increased deductibles, and increased out-of-pocket maximums. Plaintiffs argue that these changes violated the parties' CBAs' promise of long-term benefits.

Pursuant to the stipulation of the parties, I previously certified two classes of plaintiffs in this litigation. Class 1 members, including plaintiffs Merrill and Weber, retired from a Milwaukee area facility between August 1, 2000 and August 1, 2006 with 30 years of service, had hire dates prior to 1980, and had not reached age 65 as of August 1, 2010. These class members retired under the 1998 and 2002 CBAs, which state the following

---

[1] The precise language of the CBAs will be discussed in detail below.

[2] The majority of retirees were enrolled in an EPO plan prior to 2010, which generally provides less expensive coverage but within an exclusive network of providers, while PPO plans generally provide more expensive coverage but with more flexibility in provider options.

with respect to their retiree benefits: "the premium cost for [medical, dental and vision] coverage will be fully-paid by the Company for up to 10 years, but not beyond age 65." Eisenberg Decl. Ex. Q at 75 (ECF No. 119-17); *id.* at 93. Class 2 members, including plaintiff Carpenter, retired from a Milwaukee area facility on disability before August 1, 2006 with between 10 and 30 years of services and had not reached age 65 as of August 1, 2010. All class 2 members retired under the 1998 and 2002 CBAs, which state that they "are eligible for Company paid medical benefits until age 65." Eisenberg Decl. Ex. Q at 75 (ECF No. 119-17); *id.* at 93.

## II. Discussion

### A. Statute of Limitations

First, I briefly address defendants' argument that plaintiffs' claims are barred by the statute of limitations. The LMRA and ERISA do not provide a statute of limitations for the types of claims plaintiffs bring, so I apply the most analogous state statute of limitations. *United Indep. Flight Officers, Inc. v. United Air Lines, Inc.*, 756 F.2d 1262, 1271–72 (7th Cir. 1985). Because this is a breach of contract claim, I apply Wisconsin's 6-year statute of limitations to this case. *See* Wis. Stat. § 893.43 (imposing a 6-year statute of limitations for breach of contract claims); *Ruppert v. Alliant Energy Cash Balance Pension Plan*, 726 F.3d 936, 941 (7th Cir. 2013) (concluding that Wisconsin's 6-year statute of limitations for breach of contract claims is the most analogous for § 502 ERISA claims). However, I apply federal law in determining when a claim accrued. *Daill v. Sheet Metal Workers' Local 73 Pension Fund*, 100 F.3d 62, 65 (7th Cir. 1996) ("Even when relying on an analogous state statute of limitations . . . we look to federal common law for purposes of determining the

accrual date of a cause of action under a federal statute such as ERISA.").

Plaintiffs filed their complaint in August 2010; thus, their claims must have accrued prior to August 2004 to be within the statute of limitations. "[T]he general federal common law rule is that an ERISA claim accrues when the plaintiff knows or should know of conduct that interferes with the plaintiff's ERISA rights." *Thompson v. Ret. Plan for Emps. Of S.C. Johnson & Son, Inc.*, 651 F.3d 600, 604 (7th Cir. 2011) (internal quotations and citation omitted). This requires "a clear and unequivocal repudiation of rights under the . . . plan which has been made known to the beneficiary." *Id.* Defendants argue that plaintiffs' claims accrued when the company first informed retirees of unilateral changes to their allegedly unalterable benefits and when the parties began bargaining for changes to retiree benefits, which was well before August 2004. As examples, defendants point to collectively bargained changes to retiree benefits in 1983, Briggs' unilateral termination of a health plan in 2001, Briggs' unilateral changes to prescription drug providers in 2001, and reservation of rights language included in enrollment materials as early as December 2003. I reject this argument for several reasons. First, it is not these earlier actions plaintiffs challenge as a violation of the CBAs; plaintiffs challenge 2010 and later changes to retiree benefits, which fall within the 6-year limitation period. Second, it is not clear from the record whether the unilateral changes Briggs points to resulted in a material change to the level of benefits retirees received, and thus it is not clear that these changes were "a clear and unequivocal repudiation of rights." Third, it is unclear from the record whether the materials containing reservation of rights materials were actually sent to all class members. Thus, I conclude that plaintiffs' claims challenging the 2010 changes to retiree benefits is not barred by the statute of limitations.

4

**B. Expert Witness Challenges**

**1. Motion to strike**

The parties have filed several motions regarding expert witnesses. First, defendants ask me to strike the second rebuttal report by plaintiffs' expert Howard Atkinson, Jr., arguing that it was not authorized by my scheduling order or contemplated by the parties. Near the end of discovery, there was some confusion as to whether plaintiffs' complaint challenged only defendants' initial changes to retiree benefits in 2010, or whether it also challenged subsequent changes in 2011, 2012, and 2013. I allowed plaintiffs to amend their complaint to clarify that subsequent changes were included, and I permitted defendants' expert to file a reply report addressing the subsequent changes. Defendants' expert did so on June 27, 2014, and two months later, plaintiffs' expert submitted a second rebuttal report (it had already issued a first rebuttal report as part of the original expert discovery schedule). Defendants argue that the second rebuttal report was improper. Plaintiffs counter that in his June 27 reply report, defendants' expert, Adam Reese, changed some of his calculations related to the 2010 changes (as well as addressing the subsequent changes) and thus the second rebuttal report was necessary to rebut these new opinions. Specifically, in comparing the pre-2010 retiree plan and post-2010 retiree plan, Reese adjusted his calculations of the actuarial value of both plans to account for a 10% out-of-network utlization,[3] a figure defendants assert was the same utilization estimate Atkinson used in his calculations of both plans. Thus, defendants argue, the reply did not use new methodology or calculations but simply adjusted its old methodology in response

_____

[3] This is an estimate that approximately 10% of claims under a plan are for out-of-network providers, resulting in a higher out-of-pocket expense to the retiree.

to plaintiffs' expert's opinion, and because no new methodology was used, plaintiffs' expert should not have the benefit of responding.

I will not strike the second rebuttal report on these technical grounds. *See Torres v. Oakland Scavenger Co.*, 487 U.S. 312, 316 (1988) ("[T]he requirements of the rules of procedure should be liberally construed and . . . 'mere technicalities' should not stand in the way of consideration of a case on its merits."). Although plaintiffs' should have sought permission from the court to produce a second rebuttal report before doing so, defendants' expert opened the door to a rebuttal by changing his calculations for the 2010 plan changes when the purpose of the additional reply report was to address the 2011, 2012, and 2013 claims. Plaintiffs make a strong case that defendants' expert incorrectly applied the 10% utilization figure to one of the plans at issue, illustrating the necessity of the second rebuttal report. Although defendants state that they will be prejudiced by use of this report and will need an opportunity for additional discovery and to file supplemental expert reports, they point to no information in the second rebuttal report which is new or a surprise.[4] *Banister v. Burton*, 636 F.3d 828, 833 (7th Cir. 2011) (concluding that the failure to timely file expert report was "clearly harmless" in the absence of a surprise). Thus, I see no prejudice to defendants and will allow the second rebuttal report.

**2. *Daubert* motions**

Both parties have also filed motions in limine to exclude each other's expert

---

[4] To the extent that defendants argue that Atkinson's explanation in his second rebuttal report that he did not apply the 10% out-of-network utilization figure to all plans is new or surprising to them, I reject this argument. As plaintiffs point out, Atkinson's initial report shows that he did not apply the 10% figure to the Plan D, the most popular pre-2010 plan, but did to Plan B, the most popular post-2010 plan. *See* Pls.' Reply at 5-6 (ECF No. 172).

testimony based on *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993). These motions boil down to a dispute over the proper methodology for calculating and comparing the actual costs of health care plans; each side's actuary used a different methodology for comparing Briggs' pre- and post-2010 retiree plans and for determining whether, in their expert opinion, the changes were "material," in other words whether the post-2010 benefits were reasonably commensurate with the pre-2010 benefits.[5]

When reviewing a summary judgment motion, I may only consider evidence that would be admissible at trial. *Hardrick v. City of Bolingbrook*, 522 F.3d 758, 761 (7th Cir. 2008). Federal Rule of Evidence 702 governs expert witness testimony and states that expert witness testimony is admissible if (1) the witness is qualified by knowledge, skill, experience, training, or education; (2) the witness's specialized knowledge will help the jury understand evidence or determine a fact issue; (3) the testimony is based on sufficient facts or data; and (4) the expert has reliably applied principles and methods to the facts of the case. *See also Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137 (1999); *Daubert*, 509 U.S. 579. The court functions as a "gatekeeper" to exclude unreliable expert testimony. *Kumho Tire*, 526 U.S. at 148. The key inquiry is "the validity of the methodology employed by an expert, not the quality of data used in applying the methodology or the conclusions produced." *Manpower, Inc. v. Ins. Co. of Pa.*, 732 F.3d 796, 806 (7th Cir. 2013).

The biggest difference in the experts' methodology is that plaintiffs' expert, Atkinson, calculated the "relative value" of the plans while defendants' expert, Reese, calculated the "actuarial value" of the plans. The parties agree that the actuarial value reflects the

---

[5] I discuss the "reasonably commensurate" standard in detail below.

7

percentage of medical costs borne by the retiree while the relative value reflects the total cost of a plan to the employer. Atkinson used a proprietary software tool called Apex to calculate the relative value, while Reese used the minimum value ("MV") calculator developed by the Department of Health and Human Services to calculate the actuarial value. Both sides challenge the others' use of these differing methods and tools.

I will reject this argument as to both experts. Although the parties challenge each others' experts' use of the differing tools and methodologies in this specific case, both parties concede that the tools and methodologies used by both experts are generally accepted tools in the actuary field; plaintiffs concede that the MV calculator is a commonly-used actuarial tool and the calculation of the actuarial value is a commonly-used methodology, and defendants concede that their expert has used software tools similar to Atkinson's to calculate relative value in the past. Thus, it appears that the methodology used by both experts is reliable and commonly used in the actuary field, thus I will not exclude either expert on these grounds. "The soundness of the factual underpinnings of the expert's analysis and the correctness of the expert's conclusions based on that analysis are factual matters." *Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir. 2000).[6]

The parties also challenge each others' experts on the materiality of the changes, arguing that their methods are not reliable. I also reject this argument as to both experts.

_____

[6] Plaintiffs also challenge defendants' expert Reese on the grounds that (a) his use of the 10% out-of-network utilization figure was unfounded, (b) his opinions criticizing relative value calculations are unfounded and contradict his prior work, and © his conclusions are unreliable because he failed to account for the fact that participants use richer benefit plans more often. These are challenges not to the methodology but to either facts and assumptions used in applying a methodology or to the credibility of an expert, both issues for the jury.

8

Plaintiffs' expert Stuart Wohl used his knowledge and experience and considered several different benchmarks, some of which defendants' expert also appears to have used, in forming his opinion. Defendant's expert Reese used his knowledge and experience but based his conclusion on different benchmarks. Whether the benchmarks and assumptions the experts used in their analyses are reliable is a jury question. *Manpower, Inc.*, 732 F.3d at 808. ("The reliability of data and assumptions used in applying a methodology is tested by the adversarial process and determined by the jury; the court's role is generally limited to assessing the reliability of the methodology . . . of the expert's analysis.").[7]

## C. Scope of the Claims

In conjunction with their *Daubert* motions the parties raised one additional issue, namely whether or not this case is about solely the changes defendants made to retiree medical plans or whether it also includes changes to retiree dental and vision plans. Defendants argue that plaintiffs' complaint only pleads that Briggs' changes to the medical benefits, and not changes to dental and vision benefits, violated the LMRA and ERISA. Because of this understanding, defendants' expert did not analyze changes to the dental and vision benefits, while plaintiffs' experts did.

The operative complaint is plaintiffs' supplemental and corrected complaint (ECF No. 101). Plaintiffs describe the insurance coverage at issue in this case by directly quoting

---

[7] Defendants also argue that plaintiffs' expert Wohl's testimony should be excluded because it is based on the relative value calculations of Atkinson. Because I am allowing Atkinson's testimony, I will not exclude Wohl's for this reason. Defendants also challenge Wohl's testimony because he is not an actuary. I reject this argument. Wohl has over 25 years of experience evaluating retiree health programs, and the fact that he is not an actuary is not a problem because he did not do actuarial work; he used Atkinson's actuarial calculations in forming his opinion.

9

the CBAs at issue, which provide for company-paid coverage for "medical, dental, and vision benefits." *See, e.g.*, Supp. Compl. at ¶¶ 3, 20, 21, 23. Plaintiffs then describe changes made in 2010 and after, including changes to dental and vision plans. *Id.* at ¶ 34. In subsequent paragraphs, plaintiffs refer generally to "insurance coverage." *See*, *e.g.*, *id.* at ¶ 32 ("Briggs & Stratton has now announced drastic reductions in the retiree insurance coverage of Class Members."); *id.* at 16 (requesting declaratory, injunctive, and monetary relief with respect to changes to "retiree insurance coverage" and "retiree insurance benefits"). The most reasonable interpretation of the term "insurance coverage" is that it embodies the medical, dental, and vision coverage described previously in the complaint, and not that it is limited to medical coverage. Thus, I conclude that the complaint does adequately plead that changes to retiree dental and vision benefits violated the LMRA and ERISA.[8] *See id.* at ¶ 52 (alleging in regards to their LMRA claim that "[a]s detailed above, the CBAs conferred upon all Class Members a right to certain retiree insurance coverage . . . . By unilaterally reducing and terminating this coverage, Briggs & Stratton breached these contracts."); *id.* at ¶ 55 (alleging in regards to their ERISA claim that "[a]s detailed above, the CBAs conferred upon all Class Members rights to certain retiree insurance coverage . . . . Defendants violated to terms of these CBAs by unilaterally terminating or reducing this coverage.").

**E. Summary Judgment**

I now address the substantive issues raised in the cross-motions for summary judgment. I may grant summary judgment where there is no genuine issue of material fact

---

[8]Accordingly, I will not strike portions of plaintiffs' experts' reports which discuss changes to dental and vision benefits.

and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). In determining whether summary judgment is appropriate, I consider all evidence submitted by the parties, and I draw all inferences in favor of the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

Plaintiffs allege that defendants' unilateral changes to retiree benefits violated the terms of their CBAs in violation of the LMRA, 29 U.S.C. § 185(a), which authorizes "suits for violation of contracts between an employer and a labor organization." Plaintiffs further allege that defendants' changes to retiree benefits violated the ERISA, 29 U.S.C. § 1132(a)(1)(B) and (a)(3), which authorizes participants to bring suit "to recover benefits due . . . under the terms of the plan" or "to enjoin any act or practice which violates . . . the terms of the plan." Their key argument is that retiree medical, dental, and vision benefits are vested under the CBAs, and thus defendants cannot unilaterally change them. Defendants argue that the CBAs limited retirees' right to benefits to the term of the CBA and that unilateral changes after the CBA expired is not a violation.

The parties agree that the benefits at issue in this case are "welfare" benefits which do not automatically vest. *See Diehl v. Twin Disc, Inc.*, 102 F.3d 301, 305 (7th Cir. 1996). Thus, whether or not plaintiffs' benefits vested is a question of contract interpretation, and I apply federal principles of contract construction when interpreting the CBA. *Id*. I give terms their ordinary and popular meaning. *Id.* There is a presumption that when a CBA is silent on whether health benefits vest, they do not, *Bidlack v. Wheelabrator Corp.*, 993 F.2d 603, 606–07 (7th Cir. 1993), but this presumption drops off when there is some language to suggest vesting, *Rossetto v. Pabst Brewing Co., Inc.*, 217 F.3d 539, 544 (7th Cir. 2000).

11

I may consider extrinsic evidence with respect to the parties' intent only if the language of the CBA is ambiguous, meaning that it is susceptible to more than one interpretation and that the ambiguity is not clarified elsewhere. *Bland v. Fiatallis N. Am., Inc.*, 401 F.3d 779, 784 (7th Cir. 2005). The CBA may contain a patent ambiguity, when the language of the CBA is unclear, or a latent ambiguity, when the language is clear but a party presents objective, extrinsic evidence which creates unclarity. *Rossetto*, 217 F.3d at 543; *Int'l Union v. ZF Boge Elastmetall LLC*, 649 F.3d 641, 649 (7th Cir. 2011) (defining latent ambiguity as "an ambiguity that becomes apparent only in consideration of the surrounding circumstances"). When determining whether a latent ambiguity exists, I may only consider objective evidence which does "not require determining the credibility of a party's self-serving testimony." *Rossetto*, 217 F.3d at 543–44.

Where the language is unambiguous, a contract's meaning is a matter of law and may appropriately be decided on summary judgment. *Diehl*, 102 F.3d at 305. Where a contract is either patently or latently ambiguous, I must consider extrinsic evidence to determine the parties' intent, and I may consider all evidence, not just objective evidence, in doing so. *Rossetto*, 217 F.3d at 547. The analysis of extrinsic evidence may lead to fact issues and preclude summary judgment. *Diehl*, 102 F.3d at 305.[9]

----

[9]The Seventh Circuit states that the law falls into three categories:

> 1. If a collective bargaining agreement is completely silent on the duration of health benefits, the entitlement to them expires with the agreement as a matter of law (that is, without going beyond the pleadings), unless the plaintiff can show by objective evidence that the agreement is latently ambiguous, that is, that anyone knowledgeable about the real-world context of the agreement would realize that it might not mean what it says. . . .
> 2. If the agreement makes clear that the entitlement expires with the

12

When considering plaintiffs' rights to benefits under the CBA, I must answer two questions. First, I must determine whether plaintiffs have a vested right to benefits, that is whether the CBA entitles them to continued benefits after its expiration. *Diehl*, 102 F.3d at 305–06. If so, I must determine the scope of benefits to which they are entitled. *Id*. Both parties agree that because plaintiffs all retired under the 1998 and 2002 CBAs, the relevant provisions of these contracts, which are identical, govern.

**1. Whether benefits vested**

Two sections of the 1998 and 2002 CBAs regarding the duration of benefits are relevant. Article XIII, Section 6(a) states that the:

> Company will, to the extent later provided [in] this agreement, pay the premium cost of the Group Life, Health and Accident Insurance Plans covering employees and their dependents as designated in the Plans. The benefits provided for in the existing Group Insurance Plans, plus those added in connection with this agreement, will be maintained during the term of this agreement.

Eisenberg Decl. Ex. Q at 69 (ECF No. 119-17); *id.* at 82. Section 8 of the "Group Insurance Plan" provision states:

---

> agreement, as by including such a phrase as "during the term of this agreement," then, once again, the plaintiff loses as a matter of law unless he can show a latent ambiguity by means of objective evidence. . . .
> 3. If there is language in the agreement to suggest a grant of lifetime benefits, and the suggestion is not negated by the agreement read as a whole, the plaintiff is entitled to a trial. Of course, if the agreement expressly grants such benefits, the plaintiff is entitled, not to a trial, but to a judgment in his favor. We are speaking of a case in which merely suggestive language creates a patent ambiguity.

*Rossetto*, 217 F.3d at 547.

13

**INSURANCE FOR RETIREES**

(a) For employees who retire after 30 years of service, Company paid medical, dental and vision benefits will continue until age 65. For employees so retiring after 1-1-92, the premium cost for the coverage will be fully-paid by the Company for up to 10 years, but not beyond age 65. For any balance of time between the 10 year maximum and age 65, Company contributions will be limited to the extent as provided for non-retirees in Section 6(b) and (c).

Employees with more than 10 but less than 30 years of service, who retire by reason of permanent and total disability, are eligible for Company paid medical benefits until age 65.

Eisenberg Decl. Ex. Q at 75 (ECF No. 119-17); *id.* at 93.

The language of Section 8 is sufficient to defeat the presumption against vesting of health benefits because the contract is not silent on the question. *Rossetto*, 217 F.3d at 544; *see also Temme v. Bemis Co.*, 622 F.3d 730, 736 (7th Cir. 2010) (stating that "we have previously rejected the position that 'magic words' or unequivocal contract language must state that lifetime benefits have been created"). All that is required is "clear and express language" providing "some positive indication of ambiguity, something to make you scratch your head." *Rossetto*, 217 F.3d at 544. Here, the CBAs are not silent on the duration of benefits; they promise that "Company paid" coverage "will continue" and that employees "are eligible" for benefits for a period of time that far outlives the 4-year term of the CBAs, strongly suggesting that the duration of retiree benefits outlasts the CBA. *See Temme*, 622 F.3d at 736–37 (stating that words like "eligible" do not undermine what otherwise appears to be a commitment to provide benefits). Thus, this case is not in *Rossetto*'s first category.

However, when read as a whole, the CBA limits Section 8's grant of long-term

14

benefits. Section 6(a) states that benefits will only be "maintained during the term of the agreement," and this language "makes clear that the entitlement expires with the agreement." *Rossetto*, 217 F.3d at 547. "It is well established that 'lifetime' benefits can be limited to the duration of a contract." *Cherry v. Auburn Gear, Inc.*, 441 F.3d 476, 483 (7th Cir. 2006), and in situations similar to this, where CBAs include language that on the one hand purports to extend benefits that outlive the term of the CBA and on the other hand to limit the provision of health benefits to the term of the CBA, the Seventh Circuit has held that phrases such as "for the term of the agreement" or "during the term of the agreement" effectively limit entitlement to benefits to the term of the agreement. *See id.* (concluding that "lifetime" benefits can be limited to the duration of a contract when the contract includes overriding preamble language limiting maintenance of benefits to the period of the agreement); *Pabst Brewing Co., Inc. v. Corrao*, 161 F.3d 434 (7th Cir. 1998) (concluding that language limiting employer's obligation to provide benefits for the term of the agreement unambiguously does not vest health benefits).

The fact that the phrase "during the term of this agreement" appears in a separate section of the CBA or that the section is titled "General" does not limit its application to active employees. *See Cherry*, 441 F.3d at 483 (concluding that a general preamble including reservation of rights language "acts as an overriding preamble for both active and retired employees").[10] Thus, on its face, the CBAs appear to unambiguously limit the

---

[10] Plaintiffs argue that the "during the agreement" language of Section 6(a) is limited to active employees because the preceding sentence relates to active employees only. However, despite not mentioning retirees, Section 6(a) states that "[t]he benefits provided for in the existing Group Insurance Plans . . . will be maintained during the term of the agreement," Eisenberg Decl. Ex. Q at 69; *id.* at 81–82, and retirees' health insurance benefits are part of the Group Insurance Plans–in fact, the

duration of retiree benefits to the term of the CBA, fitting into *Rossetto*'s second category. *Rossetto*, 217 F.3d at 547. In order to survive summary judgment, plaintiffs must show a latent ambiguity by means of objective evidence.

In determining whether a latent ambiguity exists, I will not consider any of plaintiffs' declarations, affidavits, or deposition testimony, as they do not constitute objective evidence and in considering them, I run the risk of relying on self-serving testimony. *See id.* at 543. However, I will consider Section 8(e) of the 2006-2010 CBA, which states that "[f]or employees who retire on or after 8-1-06, coverage . . . shall be the same coverage(s) offered active employees and are subject to change if different insurance plans are negotiated for active employees." Eisenberg Decl. Ex. Q at 107 (ECF No. 119-17). The 2006 CBA went into effect August 1, 2006, and this section distinguishes between retirees who retired before the 2006 CBA went into effect (including plaintiff class members, who retired under the 1998 and 2002 CBAs) and those who retired after it went into effect. Such a provision, which did not exist in previous CBAs, provides that retiree benefits for those retiring under the 2006 CBA are subject to change and thus not vested, implying that at least some retiree benefits under previous CBAs were vested. In light of this subsequent provision, it is reasonable to conclude that the parties intended pre-2006 retiree benefits to vest despite the seemingly clear language of the 1998 and 2002 CBA language, creating a latent ambiguity in the 1998 and 2002 CBAs. *See Cherry*, 441 F.3d at 484 (stating that

---

durational language of Section 8 is listed under the general category of "Group Insurance Plans." Thus, the "during the term of the agreement" language applies to both employee and retiree benefits. *See Cherry*, 441 F.3d at 483 (concluding that similar language applies to employee and retiree benefits where the contract provision "makes no attempt to indicate that it is exclusive to active employees").

16

"a change in the language of a contract can sometimes indicate a change in meaning" sufficient to create a latent ambiguity).

Defendants' argument that it's inclusion of reservation of rights language in several documents sent to retirees does not defeat the conclusion that the CBA is latently ambiguous as to vesting. While reservation of rights language can abrogate a promise of lifetime benefits when it appears in the same contract that promises benefits, *Vallone v. CNA Fin. Corp.*, 375 F.3d 623, 634–35 (7th Cir. 2004), a document issued unilaterally by an employer cannot override a bargained-for contract. *See Alday v. Raytheon Co.*, 693 F.3d 772, 790 (9th Cir. 2012) (concluding that an employer's reservation-of-rights provisions in plan documents do not "allow[] the employer unilaterally to override express terms in the bilateral CBA"); *Temme*, 622 F.3d at 738 (concluding that the intent of the bargained agreement, not insurance documents, governs). Defendants point to reservation-of-rights language in both a "wrap" plan document created unilaterally by Briggs and to insurance documents created by Aetna, a plan provider. There is no evidence that the wrap plan document created by Briggs was incorporated into the CBA, and the policy documents created by Aetna simply state that "this plan," meaning the Aetna plan, may be changed at any time, not that the general right to company-paid medical benefits arguably granted by the CBAs could be changed or terminated. Supp. App. Part 2 of 3 at 11 (ECF No. 135-2).

Because I have found ambiguity in whether or not plaintiffs' health benefits vested under the 1998 and 2002 CBAs, I must consider extrinsic evidence to help resolve the ambiguity and determine the parties' intent. Both parties have submitted extrinsic evidence

17

which they argue conclusively proves their interpretation of the CBAs. Much of this evidence revolves around the past bargaining history and changes to retiree benefits. For example, plaintiffs provide evidence that Briggs' employees considered retiree benefits vested and communicated this to retirees. *See, e.g.*, Eisenberg Decl. Ex. A at 37 (ECF No. 119-1) (Briggs internal presentation script on retirement benefits stating that "[c]overage is also keyed to the <u>time</u> of retirement"); Eisenberg Decl. Ex. B at 49–59 (ECF No. 119-2) (group enrollment letters sent to retirees with differing information going to retirees under different CBAs); Eisenberg Decl. Ex. I at 10–11 (ECF No. 119-9) (plaintiff Merrill's deposition transcript, which states that Briggs' representative Barbara Ehlers told retirees at a CBA ratification meeting that "the question was . . . Do you keep the same benefit level for the ten years? And she said yes, just that the providers could change"). Defendants dispute plaintiffs' evidence and point to several changes to retiree benefits it instituted previously and that plaintiffs did not object to. *See, e.g.*, Pls.' Proposed Findings of Fact at 4 (admitting that they "negotiated a change in retiree benefits"). Each side also provides sworn statements from their respective collective bargaining representatives regarding their understanding of the nature of retiree benefits before 2006, which unsurprisingly do not match. *Compare, e.g.*, Eisenberg Decl. Ex. F at 8–9 (ECF No. 119-6 (deposition transcript of union negotiator Ernie Dex), *with* Supplemental Appendix Part 3 of 3 at 93 (ECF No. 155-3) (Declaration of Briggs' representative Craig Reynolds). Sorting through these types of factual disputes is a job for the fact finder, precluding summary judgment. Thus, plaintiffs are entitled to a trial on the question of whether or not their benefits vested under the CBAs.

**2. Level of benefits vested**

If plaintiffs' benefits are vested under the 1998 and 2002 CBAs, I must also determine the level of benefits to which they are entitled. Defendants did not terminate plaintiffs' medical benefits; they merely modified them. Thus, it is possible to conclude that the modifications did not violate plaintiffs' rights even if those rights are vested. *Diehl*, 102 F.3d at 309. Here, the 1998 and 2002 CBAs are vague as to exactly what benefits are vested. Plaintiffs argue that the contract entitles them to, with limited exceptions, "no bills, claims forms, or out-of-pocket expenses to the employee beyond certain per service deductibles." Eisenberg Decl. Ex. Q at 72; *id.* at 85. While this language clearly does not authorize defendants to "'modify' coverage until it [becomes] all but nominal," it also does not appear to require defendants "to provide for the life of its retirees the precise benefits described in insurance booklets" draft in 1998 and 2002. *Diehl*, 102 F.3d at 309. Rather, if benefits are vested, the answer is somewhere in the middle. *Id.* ("We are faced . . . with a continuum of options that lies between these two intuitively implausible results.").

In situations such as this, the Seventh Circuit asks whether the level of coverage retirees receive after the changes is "reasonably commensurate" with coverage they received before the changes. *Id.* at 311; *see also Zielinski v. Pabst Brewing Co., Inc.*, 463 F.3d 615 (7th Cir. 2006) (adopting a "reasonably commensurate" test in order to "steer[] between implausible extremes"). To show that the modified benefits are not reasonably commensurate, plaintiffs must do more than merely "demonstrate that the changes have increased payments for some retirees." *Diehl*, 102 F.3d at 311. They must show that the changes "have significantly reduced" the "general level of benefits" to the entire class. *Id.*

19

Both parties offer evidence relating to whether or not the current benefits are "reasonably commensurate" with the benefits they received before the 2010 changes, and most of this evidence is in the form of expert opinion. Because I have denied both sides' motions to exclude the other's expert witnesses, I must consider what both sides' experts have opined, and each side's experts hold different opinions as to the value of the plans and whether or not the changes are material. *Compare* Eisenberg Decl. Ex. P at 4 (ECF No. 119-16) (plaintiffs' expert report opining that the post-2010 Plan B is 7.68% less valuable than the pre-2010 Plan D) *and* Eisenberg Decl. Ex. O at 5 (ECF No. 119-15) (plaintiffs' expert report opining that the 2010 plan changes were material), *with* Glenn Decl. Ex. A at 16–17 (ECF No. 147-1) (defendants' expert report opining that the post-2010 Plan B is 3.5% less valuable than the pre-2010 Plan D and that this change is not material). Thus, summary judgment is not appropriate, and plaintiffs are entitled to a trial on the issue of whether the 2010 and subsequent changes are reasonably commensurate with the pre-2006 benefits. I note, however, that plaintiffs will first need to succeed in proving that the parties intended for the benefits to vest, using extrinsic evidence, before it is entitled to reasonably commensurate benefits.

**E. Motion to Seal**

Plaintiffs have also filed a motion to seal documents that defendants marked as confidential under the protective order. Defendants have indicated that there is no need to maintain these documents under seal, therefore the motion to seal will be denied.

20

### III. Conclusion

**THEREFORE, IT IS ORDERED** that plaintiffs' motion for summary judgment (ECF No. 115) is **DENIED**.

**IT IS FURTHER ORDERED** that defendants' motion for summary judgment (ECF No. 121) is **DENIED**.

**IT IS FURTHER ORDERED** that plaintiffs' interim motion to seal (ECF No. 120) is **DENIED**.

**IT IS FURTHER ORDERED** that defendants' motion to strike/motion to exclude the second rebuttal reports (ECF No. 142) is **DENIED**.

**IT IS FURTHER ORDERED** that defendants' motion in limine to exclude Atkinson and Wohl (ECF No. 145) is **DENIED**.

**IT IS FURTHER ORDERED** that plaintiffs' motion in limine to exclude Reese (ECF No. 157) is **DENIED**.

Dated at Milwaukee, Wisconsin, this 2nd day of September, 2015.

s/ Lynn Adelman

_____

LYNN ADELMAN
District Judge

21