# EXHIBIT 1

| | |
|---|---|
| MICHAEL MERRILL, GREGORY WEBER, JEFFREY CARPENTER, on behalf of themselves and all other persons similarly situated; and UNITED STEEL, PAPER AND FORESTRY, RUBBER, MANUFACTURING, ENERGY, ALLIED INDUSTRIAL AND SERVICE WORKERS INTERNATIONAL UNION, AFL-CIO/CLC, | Case No. 10-C-0700-LA |
| Plaintiffs, | |
| v. | |
| BRIGGS & STRATTON CORPORATION; GROUP INSURANCE PLAN OF BRIGGS & STRATTON CORPORATION; and DOES 1 THROUGH 20, | |
| Defendants. | |

## STIPULATION OF SETTLEMENT

Counsel for Plaintiffs Michael Merrill, Gregory Weber, and Jeffrey Carpenter, on behalf of the Class as defined below, and for Plaintiff the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, and counsel for Defendants Briggs & Stratton Corporation and the Group Insurance Plan of Briggs & Stratton Corporation, enter into this Stipulation of Settlement with the approval and authority of their respective clients, pursuant to Federal Rule of Civil Procedure 23. Capitalized terms used herein shall have the meanings set forth in the Definitions section below.

## RECITALS

This Settlement Agreement is entered into by and between the USW, and the Named Plaintiffs in this Action, for themselves and on behalf of the Class; and Defendants.

A.     On August 16, 2010, the USW and Named Plaintiffs filed this Action.  The Named Plaintiffs filed the Action as a class action on behalf of a putative class of certain former employees of the Company who were previously represented in collective bargaining by the USW (or its predecessor unions) and retired from the Company's Wisconsin facilities before August 1, 2006.

B.     On September 17, 2012, the USW and Named Plaintiffs filed an Unopposed Motion for Class Certification.  On October 9, 2012, the Court granted the Unopposed Motion for Class Certification, certifying the following two classes:

i.     Class 1:  Former employees of the Company who were represented by the USW (or its predecessors) and who: (i) were hired by the Company prior to 1980; (ii) prior to reaching age 65 retired from a Milwaukee area facility operated by the Company between August 1, 2000 and August 1, 2006, with at least 30 years of service; (iii) had not reached age 65 prior to August 1, 2010;  (iv) received health insurance benefits under one or more plans sponsored by the Company after retirement (or retained the right to opt in to said plans under plan rules as they existed prior to August 1, 2006); and (v) claim under Section 502(a)(1)(B) of ERISA and Section 301 of the LMRA that, under the terms of the governing collective bargaining agreements and plan documents, they are entitled to be provided unalterable post-retirement medical benefits at the same levels and for the same duration as when they retired ("Class No. 1").

ii.     Class 2:  Former employees of the Company who were represented by the USW (or its predecessors) and who: (i) prior to reaching age 65 and prior to August 1, 2006 retired from a Milwaukee area facility operated by the Company by reason of permanent and total disability with more than 10 but less than 30 years of service; (ii) had

2

not reached age 65 prior to August 1, 2010; (iii) received health insurance benefits under one or more plans sponsored by the Company after retirement (or retained the right to opt in to said plans under plan rules as they existed prior to August 1, 2006); and (iv) claim under Section 502(a)(1)(B) of ERISA and Section 301 of the LMRA that under the terms of the governing collective bargaining agreements and plan documents, they are entitled to be provided unalterable post-retirement medical benefits at the same levels and for the same duration as when they retired ("Class No. 2").

C.  On May 1, 2014, Plaintiffs filed an amended Complaint asserting claims against Defendants under Section 301 of the Labor Management Relations Act ("LMRA") and Sections 502(a)(1)(B) and (a)(3) of the Employee Retirement Income Security Act of 1974 ("ERISA"). Plaintiffs allege that Defendants unlawfully implemented changes to the medical, dental, and vision benefits that the Company provides to Class members, including by (i) capping the annual amount that the Company contributes to the cost of the Class members' medical coverage and (ii) eliminating various legacy medical plan designs.  Plaintiffs assert that members of Class No. 1 have a vested right to receipt of the medical, dental, and vision benefits that were in place at the time of their retirements without reduction, termination, or change until they reach age 65 or for a period of ten (10) years, whichever occurs first.  Plaintiffs further assert that members of Class No. 2 have a vested right to continued receipt of the medical, dental, and vision benefits that were in place at the time of their retirements without reduction, termination, or change until they reach age 65.  The Complaint seeks equitable and monetary relief and costs and attorneys' fees.

D.      On September 22, 2014, Plaintiffs and Defendants filed cross-motions for summary judgment.  On September 2, 2015, the Court denied both motions for summary judgment and concluded that Plaintiffs were entitled to a trial.

E.      After the Court's decision denying summary judgment, on December 15, 2015, the Parties mediated this case in a private, formal mediation session conducted by independent mediator Jeffrey Lewis.  After a full-day negotiation session and subsequent discussions, the Parties reached the terms of a settlement as embodied in this Settlement Agreement.

F.      Defendants deny each and every allegation of wrongdoing asserted in the Complaint and contend they have no liability to Plaintiffs.  Defendants specifically deny that they breached the collective bargaining agreements, the Plan, any LMRA provisions, or any ERISA provisions in connection with the changes made to the medical coverage provided to Class members.

G.      Plaintiffs' Counsel has conducted an investigation into the facts, circumstances, and legal issues associated with the Action.  This investigation included examining the numerous documents and data relating to the underlying events and transactions alleged in the Complaint and Defendants' defenses, reviewing the law applicable to Plaintiffs' claims and Defendants' defenses in the Action, completing fact and expert discovery as to liability, and briefing the parties' cross-motions for summary judgment.

H.      Defendants' counsel has also conducted a thorough investigation into Plaintiffs' claims and the underlying events and transactions alleged in the Complaint.  Defendants' counsel reviewed numerous documents and data relating to the allegations in the Complaint and thoroughly studied the law applicable to Plaintiffs' claims and their defenses in the Action.

4

I.     Based on their investigation of the merits of this dispute, the conduct of this

Action to date, and their knowledge and experience pursuing such actions generally, Plaintiffs'

Counsel believes that the Settlement will provide substantial benefits to the Class.  When the

benefits conferred by the Settlement are weighed against the attendant risks of continuing to

prosecute the Action, Plaintiffs' Counsel believes that the Settlement represents a reasonable and

fair resolution of Plaintiffs' claims.  In reaching such a conclusion, Plaintiffs' Counsel has

considered, among other things, the risks of litigation (including the risks of establishing both

Defendants' liability and the costs incurred by the Class members), the time necessary to achieve

a final resolution through trial and any appeals, the complexity of the claims set forth in the

Complaint, and the benefits accruing to the Class under the Settlement.

J.     Although Defendants continue to deny all liability with respect to any and all of

the claims alleged in the Complaint, Defendants nevertheless consider it desirable that the Action

be conclusively settled and terminated on the terms and conditions set forth below.  The

settlement of the Action and the attendant final dismissal of the Action will avoid the substantial

expense, inconvenience, and risk of continued litigation and will bring Plaintiffs' claims, and any

potential related claims, to an end.

K.     The Parties have reached this Settlement, by and through their respective

undersigned counsel, on the terms and conditions set forth in this Settlement Agreement.

L.     By entering into this Settlement Agreement, Defendants do not admit the truth of

any allegation contained in the Complaint or otherwise asserted during the course of the Action.

**NOW, THEREFORE, IT IS HEREBY STIPULATED AND AGREED** that, in

consideration of the mutual covenants and promises set forth in this Settlement Agreement, the

Parties hereby agree to a full and complete settlement of the Action and dismissal with prejudice

5

of all claims asserted for the Class in the Action, on the following terms and conditions, and subject to the Court's approval:

## **DEFINITIONS**

As used in this Settlement Agreement, capitalized terms and phrases not otherwise defined have the meanings provided below:

1.1.     "Action" shall mean this action captioned *Michael Merrill, et al. v. Briggs & Stratton Corporation, et al.*, Case No. 10-cv-700 (LA), pending in the United States District Court for the Eastern District of Wisconsin.

1.2.     "Affiliate" shall mean any entity which owns or controls, is owned or controlled by, or is under common ownership or control with, a Person.  For purposes of this definition, "control" shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities or otherwise.

1.3.     "Class" shall mean all members of the two classes certified by the Court on October 9, 2012.

1.4.     "Class Notice" shall mean the notice of settlement of the Action approved by the Court in the Preliminary Approval Order.

1.5.     "Company" shall mean Briggs & Stratton Corporation, its Affiliates and each of their respective Successors-In-Interest.

1.6.     "Complaint" shall mean the Supplemental and Corrected Complaint for Breach of Labor Contract and for Breach of ERISA Plan filed in the Action on May 1, 2014.

1.7.     "Court" shall mean the United States District Court for the Eastern District of Wisconsin.

6

1.8.    "Defendants" shall mean the Briggs & Stratton Corporation and the Group Insurance Plan of Briggs & Stratton Corporation.

1.9.    "Escrow Account" shall have the meaning set forth in Paragraph 6.2.

1.10.    "Escrow Agent" shall have the meaning set forth in Paragraph 6.2.

1.11.    "Final Approval Order" shall mean the order and judgment approving the Settlement.

1.12.    "Final Fairness Hearing" shall mean the hearing in which or after which the Court determines whether to enter the Final Approval Order of the Settlement as provided in Paragraph 2.1.

1.13.    "Final" shall mean, with respect to any judicial ruling, judgment or order, that the ruling, judgment or order remains in effect and that the period for any appeals, petitions, motions for reconsideration, rehearing or certiorari or any other proceedings for review ("Review Proceeding") has expired without the initiation of a Review Proceeding, or, if a Review Proceeding has been timely initiated, that there has occurred a full and final disposition of any such Review Proceeding without a reversal or modification, including the exhaustion of proceedings in any subsequent Review Proceeding, remand and/or Review Proceeding after remand.

1.14.    "Named Plaintiffs" shall mean plaintiffs Michael Merrill, Gregory Weber, and Jeffrey Carpenter who filed this Action.

1.15.    "Net Settlement Amount" shall mean the balance of the Settlement Fund after payment of (i) any taxes and expenses charged to the Settlement Fund as discussed in Paragraph 7.1; (ii) deduction for past and future costs of administration of the Settlement, including the cost

7

of implementing the Plan of Allocation; and (iii) any award of attorneys' fees and expenses to Plaintiffs' Counsel by the Court.

1.16. "Parties" shall mean Plaintiffs and Defendants.

1.17. "Person" shall mean an individual, partnership, corporation, trust, governmental entity or any other form of legal entity or organization.

1.18. "Plaintiffs" shall mean the Named Plaintiffs and the USW.

1.19. "Plaintiffs' Counsel" shall mean Feinstein Doyle Payne & Kravec, LLC and The Previant Law Firm, S.C.

1.20. The "Plan" shall mean the Group Insurance Plan of Briggs & Stratton Corporation.

1.21. "Plan of Allocation" shall mean the Plan of Allocation to be submitted to the Court in accordance with Paragraph 9.1.

1.22. "Preliminary Approval Motion" shall have the meaning set forth in Paragraph 2.1.

1.23. "Preliminary Approval Order" shall mean the order from the Court sought by the process described in Paragraph 2.1 below.

1.24. "Released Claims" shall have the meaning set forth in Paragraph 5.2.

1.25. "Defendant Released Parties" shall mean each of the Defendants and each of their respective Representatives, insurers (including Travelers), co-insurers, re-insurers, administrators, accountants, actuaries, auditors, advisors, parent corporations, subsidiaries, predecessors, successors, committees, trustees, managers, and assigns, including without limitation any fiduciaries of the Plan.

1.26. "Plaintiff Released Parties" shall mean the Named Plaintiffs, the USW, and each of their respective Representatives and Affiliates.

8

1.27.  "Releases" shall mean the releases set forth in Paragraphs 5.1 through 5.4.

1.28.  "Representatives" shall mean current and former directors, officers, employees, agents, and attorneys.

1.29.  "Settlement" shall mean the settlement to be consummated under this Settlement Agreement pursuant to the Final Approval Order.

1.30.  "Settlement Administrator" shall mean an administrator, the appointment of which is approved by the Court on the recommendation of Plaintiffs to implement the Plan of Allocation and administer the Settlement, whose fees and costs will be paid from the Settlement Fund.

1.31.  "Settlement Agreement" shall mean this Stipulation of Settlement.

1.32.  "Settlement Fund" shall have the meaning set forth in Paragraph 6.3.

1.33.  "Successor-In-Interest" shall mean a Person's estate, legal representatives, heirs, successors or assigns, including successors or assigns resulting from corporate mergers or other structural changes.

1.34.  "USW" shall mean the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union.

## JUDICIAL APPROVAL PROCESS

2.1.  As soon as practicable following the execution of this Settlement Agreement by the Parties, but no later than April 8, 2016, Plaintiffs shall file a Motion for Preliminary Approval ("Preliminary Approval Motion") with the Court, seeking entry of the Preliminary Approval Order, including the approval of the Class Notice, which Plaintiffs' Counsel shall prepare.  Plaintiffs shall request that a Final Fairness Hearing be held at least ninety (90) calendar days from the mailing of the Class Notice, for the Court to consider whether the terms of this Settlement are fair, reasonable, and adequate and thus should be finally approved and

9

implemented by the Court pursuant to Federal Rule of Civil Procedure 23(e) (the "Final Fairness Hearing"). Defendants shall in good faith support the Motion for Preliminary Approval, provided it is consistent with the terms and conditions of the Settlement. Pursuant to the Class Action Fairness Act of 2005 ("CAFA"), Defendants shall cause the notices required by CAFA, as specified by 28 U.S.C. § 1715, to be prepared and provided to the required parties within ten (10) calendar days of the filing of the Motion for Preliminary Approval. Plaintiffs' Counsel will be copied on any and all notices provided by Defendants pursuant to this Paragraph.

2.2.    If the Court preliminarily approves the Settlement, then Defendants will, at their expense, cause the Class Notice to be transmitted as set forth in Paragraphs 2.3 through 2.5.

2.3.    Within seven (7) calendar days following the Court's entry of the Preliminary Approval Order, Defendants shall mail via first-class mail the Class Notice to all Class members to the most current mailing addresses in the possession of Defendants or their Affiliates, including Defendants' Retirement Plans.

2.4.    The costs incurred in connection with the printing and mailing of the Class Notice shall be paid by Defendants.

2.5.    In the event that a Class Notice is returned as undeliverable, the Defendants shall make reasonable efforts to obtain a valid mailing address within seven (7) calendar days of the date of the return of the Class Notice. If Defendants cannot obtain a valid mailing address, the Settlement Administrator shall make reasonable efforts to obtain a valid mailing address between the eighth and fourteenth calendar days following the date of the return of the Class Notice. In any event, such efforts must be completed no later than thirty (30) calendar days after the Preliminary Approval Order is issued. Following each search that results in a corrected address, the Defendants shall promptly resend the Class Notice to the Class member by first-class mail.

10

2.6.    If the Settlement is preliminarily approved by the Court, Plaintiffs shall timely move the Court to enter a Final Approval Order, following a Final Fairness Hearing, in which Plaintiffs will ask the Court to:

a.    Approve the Settlement, adjudge its terms to be fair, reasonable, adequate, and in the best interests of the Class, and direct consummation of this Settlement in accordance with the terms and conditions of the Settlement Agreement;

b.    Determine that the requirements of Federal Rule of Civil Procedure 23 and due process have been satisfied in connection with the distribution of the Class Notice to the Class;

c.    Approve the appointment of the proposed Settlement Administrator for the purposes of implementing the terms of the Settlement;

d.    Approve a Plan of Allocation consistent with Paragraphs 9.1 and 9.4 of this Settlement Agreement;

e.    Determine the legal fees and expenses that should be awarded or reserved for award to Plaintiffs' Counsel out of the Settlement Amount, as contemplated by Paragraphs 8.1 through 8.2 of this Settlement Agreement;

f.    Dismiss the Action with prejudice as to Defendants and extinguish, discharge and release any and all Released Claims against any and all Released Parties, and without costs except as provided herein.

## OBJECTION PROCESS

3.1.    Any Class member who wishes to object to this Settlement or otherwise to be heard concerning this Settlement shall timely file with the Court a statement of his or her objections, specifying the reasons for each objection, including any legal support or evidence that the objector wishes to bring to the Court's attention.  The objector must also mail the

11

objection and all supporting law and evidence to Plaintiffs' Counsel and Defendants' counsel at the following addresses:

| | |
|---|---|
| Marianne G. Robbins | Christopher A. Weals |
| The Previant Law Firm, S.C. | Morgan, Lewis & Bockius LLP |
| 310 West Wisconsin Ave. | 1111 Pennsylvania Ave. NW |
| Suite 100MW | Washington, DC  20004 |
| Milwaukee, WI  53203 | |

      3.2.    To be considered timely, the objection must be received no later than forty-five (45) calendar days before the Final Fairness Hearing.  If an objector hires an attorney to object pursuant to these Paragraphs, the attorney must both effect service of a notice of appearance on counsel listed above and file it with the Court no later than forty-five (45) calendar days before the Final Fairness Hearing.  Any person or entity who fails to submit such a timely written notice shall be barred from making any statement objecting to this Settlement, including at the Final Fairness Hearing, and shall forever waive his or her objection(s), except by special permission of the Court.

      3.3.    Any Party may submit a response to an objection and may file with the Court and serve on Plaintiffs' Counsel, counsel for Defendants, and the objector and his or her counsel a written response no later than twenty-one (21) calendar days before the Final Fairness Hearing.

      3.4.    Any objector who files and serves a timely, written objection may appear at the Final Fairness Hearing either in person or through counsel retained at the objector's expense. Objectors and their attorneys intending to appear at the Final Fairness Hearing must include in his or her objection the name, address, and telephone number of the objector (and, if applicable, the name, address, and telephone number of the objector's attorney).  Any objector who does not timely file an objection shall not be permitted to appear at the Final Fairness Hearing, except for good cause shown.

## DATE OF FINAL SETTLEMENT APPROVAL

4.1.     For purposes of this Settlement Agreement, "Final Settlement Approval" shall occur when all of the following have taken place:

        a.        entry of the Final Approval Order; and

        b.        the expiration of all applicable appeal periods for the appeal of the Final Approval Order without any appeal having been filed or, if any appeal is taken, entry of an order affirming the Final Approval Order and the exhaustion of any and all applicable opportunities for the further reconsideration, rehearing, or appeal of such affirmance.

## RELEASES

5.1.     Upon Final Settlement Approval, payment by Defendants of the Settlement Amount as defined in Paragraph 6.1 of the Settlement Agreement, and expiration of the time for Termination of the Settlement Agreement under Paragraph 11.1 of the Settlement Agreement, Plaintiffs and all Class members irrevocably, absolutely, unconditionally, fully, finally, and forever release, acquit, and discharge the Defendant Released Parties from Released Claims (as defined in Paragraph 5.2) that such persons or entities directly, indirectly, derivatively, or in any other capacity ever had or have based upon, related to, arising out of or in connection with the claims and allegations asserted in the Complaint.  This Release shall not release any claims relating to the covenants or obligations set forth in this Settlement Agreement; shall not include any individual claims for benefits arising in the ordinary course under the relevant plan documents or ERISA; and shall not purport to release claims for or related to persons who are not Plaintiffs or Class members.  Without limiting the foregoing, upon Final Settlement Approval, Plaintiffs and all Class members shall be deemed to have irrevocably, absolutely, and unconditionally waived any and all rights to (i) receive with regard to the Released Claims any consideration in excess of that portion of the Net Settlement Amount that shall be allocated and

13

payable to or for the benefit of such Class members in accordance with the terms and provisions of the Plan of Allocation; (ii) seek relief against the Defendant Released Parties in the Action or with respect to claims that were asserted or could have been asserted in the Action beyond that provided in this Settlement Agreement; and (iii) file any such claims in any court or adjudicatory forum.

5.2.     Subject to Paragraph 5.1, the "Released Claims" shall be any and all claims, demands, rights or causes of action of any and every kind, character or nature whatsoever (including, but not limited to, claims for any and all losses, damages, unjust enrichment, attorneys' fees, disgorgement of fees, litigation costs, injunction, declaration, contribution, indemnification, or any other type or nature of legal or equitable relief whether accrued or not, whether known or unknown in law or equity brought by way of demand, complaint, cross-claim, counterclaim, third-party claim or otherwise, arising out of any or all of the acts, omissions, facts, matters, transactions or occurrences that are, were or could have been alleged, asserted, or set forth in the Complaint or the Action, or that are related in any way to any of the allegations or claims asserted in the Complaint or the Action, including but not limited to claims that Defendants violated collective bargaining agreements, the Plan, any other agreements, the LMRA, ERISA, or any other law in connection with the modification of medical benefits the Company has provided or continues to provide to the Class members arising on or before January 1, 2016.   Released Claims shall not include any claims relating to the covenants or obligations set forth in this Settlement Agreement; shall not include any individual claims for benefits arising in the ordinary course under the relevant plan documents or ERISA; and shall not purport to release claims for or related to persons who are not Plaintiffs or Class members.

14

5.3.     The Parties stipulate and agree that, upon Final Settlement Approval, Plaintiffs expressly waive and relinquish, to the fullest extent permitted by law, any and all provisions, rights and benefits conferred by: (i) California Civil Code § 1542, which provides that a "general release does not extend to claims which the creditor does not know or suspect to exist in his or her favor at the time of executing the release, which if known by him or her must have materially affected his settlement with the debtor," or (ii) any similar state, federal, or other law, rule or regulation or principle of common law of any domestic or foreign governmental entity. Plaintiffs may hereafter discover facts other than or different from those that they know or believe to be true with respect to the subject matter of the Released Claims with respect to any Released Parties, but Plaintiffs hereby expressly waive and fully, finally and forever settle and release any known or unknown, suspected or unsuspected, asserted or unasserted, contingent or non-contingent claim with respect to the Released Claims, without regard to the subsequent discovery or existence of such other or different facts.

5.4.     Upon Final Settlement Approval, Defendants absolutely and unconditionally release and forever discharge the Plaintiff Released Parties from any and all claims relating to the institution or prosecution of the Action or the settlement of any Released Claims, except that this release shall not include any claims relating to the covenants or obligations set forth in this Settlement Agreement.

5.5.     The Parties intend the Settlement to be a final and complete resolution of all disputes asserted or that could have been asserted by Plaintiffs and Class members with respect to the Released Claims, and agree that, except as expressly set forth herein, each Party shall bear his, her or its own costs and expenses, including attorneys' fees.

## PAYMENT OF SETTLEMENT AMOUNT

6.1.    Plaintiffs agree to settle and resolve fully the Released Claims, including, but not limited to, the claims asserted against Defendants in the Action, for Three Million, Nine Hundred Fifty Thousand Dollars and no cents ($3,950,000.00) (the "Settlement Amount") and the agreements which follow concerning continuation of benefits.  Defendants shall cause the Settlement Amount to be paid consistent with the terms of this Settlement.  Except as otherwise provided herein, upon payment of the Settlement Amount, all monetary payment obligations by and on behalf of Defendants under this Settlement Agreement shall be satisfied and discharged in full.

6.2.    No later than seven (7) calendar days following the Court's entry of the Preliminary Approval Order, Plaintiffs' Counsel shall provide Defendants' counsel with the name, address, account number, federal tax identification number, and such other instructions as may be needed for Defendants to deposit the Settlement Amount into an escrow account (the "Escrow Account") at a financial institution identified by Plaintiffs' Counsel and consented to by Defendants and will be held by the Escrow Agent who will not be a Party or a representative of a Party.  The Escrow Agent may be the Settlement Administrator.

6.3.    No later than fourteen (14) calendar days following the later of the Court's entry of the Preliminary Approval Order or the date that the information identified in Paragraph 6.2 is provided, the Company shall cause the full Settlement Amount to be deposited, into the Escrow Account.  The "Settlement Fund" is the Settlement Amount deposited into the Escrow Account.

6.4.    The Settlement Fund may or may not bear interest for the benefit of the Class. Neither Defendants nor Defendants' counsel shall have any liability or responsibility of any sort for filing any tax returns or paying any taxes with respect to interest on or distribution of the Settlement Fund, unless the Fund is returned to Defendants with termination of the Settlement.

16

## PAYMENTS FROM THE SETTLEMENT FUND

7.1.     All taxes on the income of the Settlement Fund, if any, and any tax-related expenses incurred in connection with the taxation of the Settlement Fund shall be paid from the Settlement Fund, shall be considered a cost of administration of the Settlement, and shall be timely paid without further order of the Court.

7.2.     All fees and expenses of the Escrow Agent shall be paid from the Settlement Fund.

7.3.     Except for the costs related to the printing and mailing of the Class Notice, and Defendants' search for addresses of Class members and re-mailing of the Class Notice to Class members whose Class Notices are returned as undeliverable, all fees and expenses of the Settlement Administrator incurred for administration of this Settlement shall be paid from the Settlement Fund.  The Settlement Administrator's fees for administering this Settlement shall be an amount agreed to by the Settlement Administrator and approved by the Court.

7.4.     The Settlement Administrator shall be fully responsible for overseeing the distribution of the Settlement proceeds to the Class, including all related tax issues, and Defendants shall bear no responsibility with respect to the distribution of the Settlement proceeds.

7.5.     Any award of attorneys' fees, costs and expenses as set forth in the Final Approval Order shall be paid from the Settlement Fund.

7.6.     The Settlement Administrator shall provide to Plaintiffs' Counsel an accounting of all expenditures made, or to be made, in connection with the Settlement, including any distributions from the Settlement Fund.  No funds will be distributed until such time as there is an award of attorneys' fees by the Court, any award by the Court reimbursing Plaintiffs'

17

Counsel's costs and litigation expenses has occurred, the Court has approved the Settlement administration costs, and the Court has approved the Plan of Allocation for the Settlement.

## PAYMENT OF ATTORNEYS' FEES AND EXPENSES

8.1.    At least thirty (30) calendar days before the Final Fairness Hearing, Plaintiffs' Counsel shall apply to the Court for an award of attorneys' fees and the reimbursement of their costs and expenses.  Defendants shall take no position directly or indirectly on Plaintiffs' Counsel's application for attorneys' fees, costs, and expenses, provided that Plaintiffs' Counsel does not request an award of attorneys' fees higher than 33 1/3 % of the Settlement Amount.

8.2.    Upon Final Settlement Approval Plaintiffs' Counsel may instruct the Escrow Agent in writing to disburse immediately the payment of attorneys' fees and expenses from the Settlement Fund in accordance with the Court's Final Approval Order.  Defendants shall have no obligations whatsoever with respect to any attorneys' fees or expenses incurred by Plaintiffs' Counsel, which shall be payable solely from the Settlement Fund.

## PLAN OF ALLOCATION

9.1.    Plaintiffs' Counsel shall submit and propose to the Court, in connection with the motion for entry of the Final Approval Order, a Plan of Allocation that provides for the calculation, allocation, and distribution of the Net Settlement Amount.

9.2.    Within the Plan of Allocation, Plaintiffs' Counsel shall propose to the Court a Settlement Administrator to administer the Settlement in accordance with the Plan of Allocation and this Settlement.  Plaintiffs' Counsel's selection of a proposed Settlement Administrator will be subject to Defendants' approval, which shall not be unreasonably withheld.

9.3.    Defendants shall provide the Settlement Administrator, in computer-usable form, such data, through July 31, 2016, as Plaintiffs may reasonably specify as necessary for the administration of the Settlement and calculation of the amounts due under the Plan of Allocation.

18

Data through July 31, 2016 shall be provided on or before August 31, 2016. Defendants further agree to provide information and data including sample formats of data prior to July 31, 2016, to the extent reasonably available and reasonably requested by Plaintiffs, to assist the Settlement Administrator and allow for prompt distribution to Class members following Final Settlement Approval.

9.4.     As soon as is reasonably practicable following Final Settlement Approval, Plaintiffs' Counsel shall direct the Settlement Administrator to disburse the Net Settlement Amount to eligible members of the Class in accordance with the Plan of Allocation.

a.     If addresses for Class members are known to be bad as a result of returned Class Notices, for which no valid address has been obtained, the Settlement Administrator shall inform Plaintiffs' Counsel and shall make reasonable efforts to obtain a valid mailing address and shall mail the check if a new address is found.

b.     If checks are returned as undeliverable, the Settlement Administrator shall inform Plaintiffs' Counsel and shall make reasonable efforts to obtain a valid mailing address following the return of the check and shall re-mail the checks if a new address is found.

c.     Checks paid to Class members shall remain valid and negotiable for 120 calendar days from the date of issuance. If checks are not cashed in 120 days, the Settlement Administrator shall inform Plaintiffs' Counsel and shall make reasonable efforts to obtain a valid mailing address for Class members who have not cashed their check after 120 calendar days. If new addresses are found for such Class members, new checks which will be valid for an additional 90 calendar days shall be reissued and re-mailed to them.

19

d. If no valid addresses can be obtained for Class members for whom there are returned Class Notices or checks or for whom checks have not been cashed after 120 calendar days and have not been reissued, unclaimed funds remaining in the Settlement Fund after payment of all distributions under the Plan of Allocation shall be distributed in a manner as otherwise directed by the Court upon application made by Plaintiffs' Counsel.

9.5. Plaintiffs shall provide their proposed Plan of Allocation in advance of the Fairness Hearing and Plaintiffs' proposed Plan of Allocation will be described in the Class Notice.

## AGREEMENTS REGARDING CONTINUATION OF MEDICAL, DENTAL, AND VISION BENEFITS

10.1. Defendants agree that, in the year 2016, they will make no changes to the medical, dental, or vision benefits provided to Class members other than changes that were announced prior to December 15, 2015.

10.2. Defendants agree that they will provide to members of Class No. 1 who have not attained age 65 but have already exhausted ten (10) years of Company-paid medical benefits since their dates of retirement, a choice of two medical insurance arrangements until those retirees reach age 65: (i) a preferred provider plan and (ii) a high-deductible plan. Both plans will be provided to these Class No. 1 members under the same cost-sharing arrangements that are in place as of January 1, 2016, copies of which are attached as Exhibit A (2016 Benefits at a Glance) and Exhibit B (2016 premium cost sharing), subject to an annual cap to the Company's contribution toward the cost of the selected option of these two medical insurance arrangements of $12,000 for single coverage and $24,000 for family coverage (coverage that is not single). As a result, if these annual limits are reached, these Class No. 1 members will be required to pay the

difference between the annual limits and the costs incurred in equal monthly installments over a twelve month period. Defendants further agree to provide to these Class No. 1 members dental and vision benefits under the same cost-sharing arrangement that is in place as of January 1, 2016.

10.3.    Defendants agree that they will provide to members of Class No. 2 who have not attained age 65 the choice of two medical insurance arrangements until those retirees reach age 65:  (i) a preferred provider plan and (ii) a high-deductible plan.  Both plans will be provided to these Class No. 2 members under the same cost-sharing arrangements that are in place as of January 1, 2016, copies of which are attached as Exhibit A (2016 Benefits at a Glance), subject to an annual cap to the Company's contribution toward the cost of the selected option of these two medical insurance arrangements of $12,000 for single coverage and $24,000 for family coverage (coverage that is not single). As a result, if these annual limits are reached, these Class No. 2 members will be required to pay the difference between the annual limits and the costs incurred, in equal monthly installments over a twelve month period. Defendants further agree to provide to these Class No. 2 members dental and vision plans under the same cost-sharing arrangement that is in place as of January 1, 2016.

10.4.    For those former employees who retired prior to October 29, 1983, who were represented by the USW predecessors, and who retired from a Milwaukee area facility operated by the Company prior to October 29, 1983 by reason of permanent and total disability with more than 10 years of service and received health insurance benefits under one or more plans sponsored by the Company after retirement (or retained the right to opt in to said plans), Defendants will continue to provide the above two medical insurance arrangements as provided in Paragraph 10.3 of this Settlement, for the lifetimes of those retirees rather than to age 65,

21

under the same cost-sharing arrangement that is in place as of January 1, 2016, but nothing in this Paragraph shall preclude the Company from offering this limited group of retirees additional medical insurance alternatives at any time.

## RIGHT TO TERMINATE THE SETTLEMENT

11.1.    Each Party has the option to withdraw unilaterally from and terminate the Settlement in the event that:  (i) either the Preliminary Approval Order or the Final Approval Order is materially modified by the Court in a manner unacceptable to either Party; (ii) the Settlement is either not approved by the Court; or (iii) the Settlement is disapproved or materially modified upon appeal within 10 calendar days of any such Order, disapproval, modification or decision on appeal.

11.2.    In the event that the Settlement is terminated pursuant to Paragraph 11.1 of this Settlement Agreement, then:

      a.    The Settlement proposed herein shall be of no further force and effect;

      b.    Upon written notice by any Party that the Settlement has been terminated, the Settlement Fund with all interest and income earned thereon will be returned to the control of Defendants and no longer subject to the provisions of this Settlement within fourteen (14) calendar days, except that neither Plaintiffs' Counsel nor any other person shall have an obligation to reimburse the Settlement Fund for any costs and expenses of the Settlement incurred by the Settlement Fund prior to the termination date; and

11.3.    With the exception of Paragraph 11.2, which shall survive the termination of the Settlement, this Settlement Agreement and all negotiations, proceedings and statements relating thereto, and any amendment thereof, shall be null and void and shall be without prejudice to any

party hereto, and each Party shall be restored to his, her, or its respective position as it existed prior to the execution of this Settlement Agreement.

**SETTLEMENT NOT AN ADMISSION**

12.1.    The Parties understand and agree that this Settlement Agreement embodies a compromise of disputed claims, and nothing in this Settlement Agreement, including the furnishing of consideration for this Settlement Agreement, shall be deemed to constitute any finding of wrongdoing by Defendants, or give rise to any inference of wrongdoing or admission of wrongdoing or liability in this or any other proceeding.  This Settlement Agreement and the consideration provided in connection with it are made in compromise of disputed claims solely for the purpose of avoiding continued litigation costs and are not admissions of liability of any kind, whether legal or factual.  Defendants have denied, and continue to deny, that they have committed any violation of the LMRA, ERISA, or other laws and enter into this Settlement Agreement solely for the purpose of avoiding the cost and inefficiency inherent in further litigation of this Action.  Neither the facts nor the terms of this Settlement Agreement shall be offered or received in evidence in any action or proceeding for any purpose, except (i) in an action or proceeding to enforce this Settlement Agreement or arising out of or relating to the Preliminary Approval Order or the Final Approval Order, or (ii) in an action or proceeding where the release of the Released Claims may serve as a bar to recovery.

**REPRESENTATIONS AND WARRANTIES**

13.1.    The Parties represent and warrant that:

      a.    They are voluntarily entering into this Settlement Agreement as a result of arm's-length negotiations among their counsel.

      b.    They assume the risk of mistake as to facts or law.

      c.     They have carefully read this Settlement Agreement, and this Settlement

23

Agreement is signed freely by each individual executing it.

       d.    They have made whatever investigation of the facts pertaining to the Settlement and this Settlement Agreement as they deem necessary.

13.2.    Each of the attorneys executing the Settlement Agreement on behalf of one or more of the Parties warrants and represents that he or she has been duly authorized and empowered to execute this Settlement Agreement on behalf of his or her respective client or clients.

13.3.    Plaintiffs jointly and severally represent and warrant that none of the claims that were asserted or could have been asserted in the Action have been assigned, encumbered, or in any manner transferred in whole or in part.

## COVENANTS

14.1.    The Parties shall reasonably cooperate with each other to effectuate this Settlement and to implement the Class Notice program and the Plan of Allocation.  The Parties agree to cooperate to the extent reasonably necessary to effectuate and implement all terms and conditions of this Settlement Agreement and the Settlement and to exercise their best efforts to accomplish the terms and conditions of the Settlement Agreement and the Settlement.

14.2.    Plaintiffs covenant and agree:  (i) not to file against any Defendant Released Party any claim based on, related to or arising from any Released Claim; and (ii) that the foregoing covenants and agreements shall be a complete defense to any such claims against any of the respective Released Parties.

14.3.    Defendants covenant and agree:  (i) not to file against any Plaintiff or Class member any claim based on, related to, or arising from claims relating to the institution or prosecution or settlement of this Action, as well as any and all claims for contribution, indemnification, or any other claims relating to payment of the Settlement Amount; and (ii) that

24

the foregoing covenants and agreements shall be a complete defense to any such claims against any of the respective Plaintiffs.

## **MISCELLANEOUS**

15.1.    This Settlement Agreement shall be governed by the laws of the State of Wisconsin without giving effect to the conflict of laws or choice of law provisions thereof, except to the extent that the law of the United States governs any matter set forth herein, in which case such federal law shall govern.

15.2.    This Settlement Agreement constitutes the entire agreement of the Parties and may not be amended, or any of the provisions waived, except by a writing executed by all Parties.  The Parties acknowledge that it is their intent to consummate this Settlement Agreement.  The Parties intend this Settlement Agreement to be a final and complete resolution of all disputes between them relating to or arising out of, the subject matter of the Action, or which otherwise constitute Released Claims.  Accordingly, the Parties agree that the terms of this Settlement Agreement represent a good faith settlement of the Released Claims, reached voluntarily after consultation with experienced counsel.  This Settlement Agreement specifically supersedes any terms or agreements that were previously agreed upon orally or in writing by any of the Parties, including without limitation, the Mediator's Proposal executed on December 15, 2015 agreed to by Plaintiffs and Defendants through their respective counsel.

15.3.    Upon becoming operative, this Settlement Agreement shall be binding upon and inure to the benefit of the Parties, the Defendant Released Parties, and the Plaintiff Released Parties and their respective successors, assigns, heirs, estates, executors and administrators and upon any corporation, partnership or entity into or with which any such person or entity may merge or consolidate.

15.4. The waiver by any Party of any breach of this Settlement Agreement shall not be deemed or construed as a waiver of any other breach, whether prior, subsequent, or contemporaneous, of this Settlement Agreement.

15.5. This Settlement Agreement may be executed by exchange of executed signature pages by facsimile or Portable Document Format ("PDF") as an electronic mail attachment, and any signature transmitted by facsimile or PDF via electronic mail for the purpose of executing this Settlement Agreement shall be deemed an original signature for purposes of this Settlement Agreement.

15.6. The Parties shall request that the Court retain jurisdiction over the interpretation and implementation of the Settlement and this Settlement Agreement, as well as any and all matters arising out of, or related to, the interpretation and implementation of the Settlement and this Settlement Agreement.

15.7. The Parties may agree, subject to the approval of the Court where required, to reasonable extensions of time to carry out the provisions of this Settlement Agreement.

Dated: April 8, 2016                          Respectfully submitted,

Marianne Goldstein Robbins / WDE          Ellen M. Doyle

Marianne Goldstein Robbins                 Ellen M. Doyle
Nathan D. Eisenberg                        Joel R. Hurt
THE PREVIANT LAW FIRM, S.C.                FEINSTEIN DOYLE PAYNE
1555 N. River Center Drive, Suite 202        & KRAVEC, LLC
Milwaukee, WI 53212                        Allegheny Building, Suite 1705
T.: (414) 223-0433                         429 Forbes Avenue
F.: (414) 271-6308                         Pittsburgh, PA 15219
Email: mgr@previant.com                    T.: (412) 281-8400
nde@previant.com                           Email: edoyle@fdpklaw.com
                                           jhurt@fdpklaw.com

26

William T. Payne
**FEINSTEIN DOYLE PAYNE**
  **& KRAVEC, LLC**
Pittsburgh North Office
12 Eastern Avenue, Suite 203
Pittsburgh, PA  15215
T.:  (412) 492-8797
Email: <u>wpayne@fdpklaw.com</u>


*Attorneys for Plaintiffs*

_Christopher A. Weals_ /AG

William J. Delany
Christopher A. Weals
**MORGAN LEWIS & BOCKIUS, LLP**
1111 Pennsylvania Avenue, NW
Washington, DC 20004
T.: (202) 739-3000
F.: (202) 739-3001
Email: william.delany@morganlewis.com
christopher.weals@morganlewis.com

*Attorneys for Defendants*

DB1/ 87038350.1

28

# EXHIBIT A



# 2016 OPEN ENROLLMENT
## October 26 to November 6, 2015

## ELIGIBLE FOR MEDICARE?

- Read the Important Information on Page 5 to learn about how Medicare eligibility impacts your medical plan.

# 2016 OPEN ENROLLMENT IS HERE
# OCTOBER 26 – NOVEMBER 6, 2015

It's time to select your 2016 Health & Welfare Benefits. This Benefit at a Glance gives an overview of your health care benefits. Please review before you make your 2016 elections.

## WHATS CHANGING FOR 2016

We are pleased to announce that our health plan administrator will be changing to UnitedHealthcare (UHC) effective January 1, 2016. The change to UHC will not require you to enroll in your current plan, as long as you wish to remain in the same medical plan design next year. Here is a quick summary of some of the changes and highlights:

- **New health plan administrator and provider network**
  UnitedHealthcare will administer our medical and prescription drug plans beginning in 2016. Contact UHC now to verify if your providers are in network and if you will need assistance with transition of care (previously approved surgeries, cancer treatment, etc.)

- **IRS announced a change to 2016 annual Health Savings Account (HSA) contribution maximums**
  $3,350 for single coverage and employee plus coverage increases to $6,750

- **Plan Designs** - No changes to the deductibles or out-of-pocket limits

- **Definition of spouse changing from opposite-sex legal spouse to legal spouse**
  Proof of marriage is required

## ENROLLING & MAKING CHANGES TO YOUR BENEFITS

In a separate mailing you will receive a pre-confirmation statement which shows your current health care benefit elections along with your new 2016 premium costs. If you have not received your statement or if you have any questions regarding this statement, you may contact the Benefits Service Center at (877) 232-1083.

## REASONS TO GO ONLINE OR CALL THE BENEFIT SERVICE CENTER:

Although we encourage everyone to go online to view their benefit options and costs for 2016, we have identified a listing of important reasons when you MUST actively enroll. Go online or call if you are:

- Changing medical, dental or vision plans
- Waiving coverage
- Adding or removing dependents
- Changing your life insurance beneficiary
- Providing (or updating) your personal email address for future electronic delivery of information

## WHAT HAPPENS IF YOU DON'T ENROLL?

It is always smart to make an active choice based on your needs.  If you don't make an active elections:

- You will automatically be enrolled in the UHC medical and Delta Dental/Delta Vision plans at the levels of coverage you are enrolled in now. If you waive coverage now, your waived benefits will continue in 2016.

## ONLY LIMITED CHANGES ALLOWED DURING THE YEAR

Benefit decisions you make during the enrollment period, whether active elections or defaulted elections, will remain in effect for the entire calendar year unless you have a qualified life event, such as:

- Marriage
- Divorce
- Birth or Adoption of a child
- Death of your spouse or child
- Changes in your spouse's employment status
- Loss or Gain of coverage for you, your spouse, or eligible dependent

**IMPORTANT**
To change your benefit elections after a qualified life event, you must make the change online **within 30 days after the life event** occurs. If you don't make your change within 30 days and you need call center assistance, contact the Benefits Service Center at 877.232.1083.

# RESOURCES TO KEEP YOU WELL ... AND HELP SAVE YOU MONEY AT THE SAME TIME!

Briggs & Stratton has provided **at no cost to you** several resources to help you manage your health care costs.

## PATIENT CARE

This patient care advocacy service offers confidential, free assistance to non-Medicare participants:

- Understanding your health benefits
- Researching health care costs and quality data
- Referrals and provider selection
- Resolving claim issues
- Negotiating billing with doctors and hospitals

## BEST DOCTORS

To be eligible for this service, you must be enrolled in a Briggs & Stratton medical plan. Best Doctors provides confidential, individualized support to you and your physician so that you can make the best possible decisions about your health care. This service will help you in gathering information to make informed decisions if you are:

- Unsure about your health situation
- Needing an expert opinion
- Wondering about your treatment options
- Needing to find a medical provider

For information regarding Patient Care and Best Doctors, visit the bswift website library.

## PROVIDER WEBSITES:

- If you haven't already, now is the perfect time to register for our provider websites. They contain a wealth of information to help you make more informed decisions from prescription costs to finding the right provider for you. UnitedHealthcare has online consumerism tools on their sites to help supplement the work that Patient Care can do.

## TOBACCO CESSATION:

- When you're ready to quit, we're ready to help. Eligible prescribed over-the-counter and prescription tobacco cessation aids are covered by our medical plan at 100%. We encourage you to contact Patient Care or UnitedHealthcare to verify that the cessation aid your doctor prescribes is covered by the medical plan.



# MEDICAL

| | High-Deductible PPO Plan (HDHP) | | Standard PPO Plan | |
|---|---|---|---|---|
| | In-network | Out-of-network | In-network | Out-of-network |
| **Provider network** | Humana Preferred (BHCG) | | | |
| **Annual deductible** | $2,600 Individual $5,200 Family | $6,000 Individual $12,000 Family | $500 Individual $1,000 Family | $1,000 Individual $2,000 Family |
| **Annual out-of-pocket maximum** | $5,500 Individual $11,000 Family | $11,000 Individual $22,000 Family | $5,500 Individual $11,000 Family | $11,000 Individual $22,000 Family |
| | *Includes coinsurance and deductible for medical and prescription expenses.* | | *Includes coinsurance and deductible for medical expenses only. Excludes copays and prescription expenses.* | |
| **Annual maximum benefit** | Unlimited | | Unlimited | |
| **Lifetime maximum benefit** | Unlimited | | Unlimited | |

| Medical, member pays | | | | |
|---|---|---|---|---|
| **Plan coinsurance** | 5% | 40% | 20% | 40% |
| **Routine Preventive Care[1]** | 0% | 100% | 0% | 100% |
| **Office visits** | After deductible, 5% | After deductible, 40% | 20%, no deductible | 40%, after deductible |
| **Hospitalization[2]** | After deductible, 5% | After deductible, 40% | After deductible, 20% | After deductible, 40% |
| **Emergency room** | After deductible, 5% | After deductible, 5% | $150 copay (waived if admitted), then after deductible, 20% | $150 copay (waived if admitted), then after deductible, 20% |
| | *If not a true emergency, stated coinsurance percentage will be reduced to 50%* | | | |
| **Behavioral health or substance abuse** | Behavioral health or substance abuse expenses are not subject to separate plan limitations. | | | |

[1] This benefit includes preventive screenings, colonoscopies, mammograms, and immunizations  [2] Some services may require pre-certification. Contact your medical insurance provider for more details.

| Rx, member pays | High-Deductible PPO Plan (HDHP) | | Standard PPO Plan | |
|---|---|---|---|---|
| | Retail network *(30-day supply)* | Mail-order or retail *(90-day supply)* | Retail network *(30-day supply)* | Mail-order or retail *(90-day supply)* |
| | **Preventive RX and Smoking Cessation products[3] will be paid in full, no deductible.** | | | |
| **Tier 1** (low-cost generics & brand names) | After deductible, 20% | After deductible, 10% | No deductible, 20% | No deductible, 10% |
| **Tier 2** (high-cost generics & brand names) | After deductible, 30% | After deductible, 20% | No deductible, 30% | No deductible, 20% |
| **Tier 3** (higher-cost, mostly brand names) | After deductible, 40% | After deductible, 30% | No deductible, 40% | No deductible, 30% |
| **Tier 4** (high-technology drugs) | After deductible, 25% up to $100 per prescription per month | | No deductible, 25% up to $100 per prescription per month | |
| **Smoking Cessation** | Retirees and dependents participating in our medical coverage are eligible for an enhanced smoking cessation benefit. Certain prescription (and prescribed over-the-counter) cessation aids are covered at 100% under our medical plans. | | | |

*Visit www.welcometouhc.com/briggs for detailed prescription plan information*

[3] The medications that appear on the list will vary by carrier, visit www.welcometouhc.com/briggs for additional information.

# MEDICARE PARTS A AND B

Briggs & Stratton Retiree Medical Plans require plan participants to enroll in Medicare Parts A and B when first eligible.

If you do not enroll in Medicare when first eligible, the plan will estimate Medicare's payment and will only consider the net difference, leaving the estimated Medicare payment as YOUR financial responsibility. In addition, you will also be responsible for any plan out-of-pocket expenses (such as deductible and coinsurance).

If you didn't sign up for Medicare Part B when you first became eligible, you may be able to sign up during the General Enrollment Period, which runs from January 1 through March 31 of each year.

## HOW TO SIGN UP FOR MEDICARE PART B

- If you already have Medicare Part A and need Part B, you can sign up for Part B at your local Social Security office or by calling (800) 772-1213. TTY users should call (800) 325-0778.
- Additional information can be found online at http://www.medicare.gov/ or by calling your local Social Security office or by calling Medicare at (800) MEDICARE or (800) 633-4227). TTY users should call (877) 486-2048.

# MEDICARE PART D - CREDITABLE COVERAGE

If you are enrolled in the Standard or High-Deductible PPO plan and become eligible to enroll in a Medicare drug plan, there are two important things you need to know about your current coverage and Medicare's prescription drug coverage:

1. Medicare prescription drug coverage became available in 2006 to everyone with Medicare. You can get this coverage if you join a Medicare Prescription Drug Plan or join a Medicare Advantage Plan (like an HMO or PPO) that offers prescription drug coverage. All Medicare drug plans provide at least a standard level of coverage set by Medicare. Some plans may also offer more coverage for a higher monthly premium.

2. Briggs & Stratton has determined that the prescription drug coverage under the **Standard PPO and High Deductible PPO plans**, on average for all plan participants, are expected to pay out as much as or more than the standard Medicare prescription drug coverage pays and is therefore considered Creditable Coverage. Because this coverage is Creditable Coverage, participants can keep this coverage and not pay a higher premium (a penalty) if they later decide to join a Medicare drug plan.

(Not available to Disability Retirees)

# DENTAL

| | Delta Dental Basic | Delta Dental Preferred |
|---|---|---|
| **Provider network** | You may use any provider you wish, but your cost is lower if you use the Delta Dental network. | |
| **Annual deductible**<br>*Applies to all services unless otherwise noted* | $25 individual, $75 family | $25 individual, $75 family |
| **Annual maximum benefit** | $1,250 per individual | $1,500 per individual[1] |
| **Dental, member pays** | | |
| **Preventive and diagnostic care**[1] | No deductible, 20% | Covered at 100% |
| **Basic restorative**<br>*e.g. fillings, root canals, etc.* | After deductible, 50% | After deductible, 20% |
| **Major restorative**<br>*e.g. crowns, bridges, etc.* | After deductible, 50% | After deductible, 50% |
| **Orthodontics**<br>*e.g. braces* | After deductible, 50% up to lifetime maximum of $1,300 per person. Covered only for dependent children to age 26 | 50%, after deductible up to lifetime maximum of $1,500 per person. Covers employees, spouses and dependent children to age 26 |

[1] *Two preventive check-ups (exams, x-rays, and cleanings) per individual each year do not count toward the annual maximum benefit (not subject to deductible).*

# VISION

| | Delta Vision Basic (EyeMed) | | Delta Vision Preferred (EyeMed) | |
|---|---|---|---|---|
| **Provider network** | You may use any provider you wish, but you receive a greater discount if you choose a provider in the EyeMed network. | | | |
| **Vision, member pays** | | | | |
| | In-network | Out-of-network | In-network | Out-of-network |
| **Eye exam**<br>*Once every 12 months* | Covered at 100% | Charges over $30 | Covered at 100% | Charges over $35 |
| **Eyeglasses** | 80% of charges over $50 | Charges over $50 | 80% of charges over $130 for frames; Basic lenses are paid in full[1] | Charges over $65 |
| | *Either eyeglass lenses or contacts are covered every 24 months; Frames covered every 24 months* | | *Either eyeglass lenses or contacts are covered every 12 months; Frames covered every 24 months* | |
| **Contact lenses** | 85% of charges over $50 | Charges over $50 | 85% of charges over $150 | Charges over $96 |
| | *Either eyeglass lenses or contacts covered every 24 months* | | *Either eyeglass lenses or contacts covered every 12 months* | |
| **Corrective surgery** | 85% of retail or 95% of promotional cost | Not covered | 85% of retail or 95% of promotional cost | Not covered |

[1] *Basic lenses are paid in full; however, additional charges will apply for add-ons such as anti-reflective coating, progressive lenses, and scratch coating.*

**Note:** *Frequency limits are calculated to the day. Example, if your last exam was on August 31, 2013, you wouldn't be eligible for another exam until August 31, 2014*

Case 2:10-cv-00700-LA    Filed 04/12/16    Page 36 of 49    Document 185-1

# LIFE INSURANCE

## Retiree life insurance (if eligible)

**Coverage Options**

If you are eligible for company-sponsored life insurance, the amount of **your life insurance coverage will be listed on your personalized confirmation statement. You will receive this statement before and after Open Enrollment**. Note: All life insurance claims are processed by the Briggs & Stratton Service Center.



## HAVE YOU UPDATED YOUR BENEFICIARIES LATELY?

If you have company-sponsored Life Insurance, it is important to ensure each year that your beneficiaries are up-to-date. If you don't go online or call during Open Enrollment to make changes, you can still easily verify beneficiary information on the confirmation statement you will receive in the mail after the close of Open Enrollment. If you need to make changes, call (877) 232-1083 or go online to http://basco.bswift.com.

## Pension Reminders

**Tax Withholding**

If you are receiving a Briggs & Stratton Pension Benefit, now is a great time to review your current state and federal tax withholding from your Pension check. To change your withholding, contact Fidelity.

**Direct Deposit**

Don't forget that Direct Deposit is the best way to ensure that you receive your Pension check on time every month. If you're interested in signing up, or you need to make any changes to your account or bank during the year, contact Fidelity.



## BENEFITS SERVICE CENTER POWERED BY BSWIFT

*Enrolling, contributions, ID cards, provider directories, family status changes, creditable coverage, life insurance claims and beneficiaries*

**http://basco.bswift.com**
(877) 232-1083
Available 7AM to 7PM CST, Monday through Friday

## PATIENT CARE

*Patient advocacy, assistance with choosing plans or providers, claim issue mediation and can provide cost or quality data for providers*

(866) 253-2273
patientcare4u.com

## UNITEDHEALTHCARE

*Advocate4Me team:*
(844) 634-1232
welcometouhc.com/briggs

## BRIGGS & STRATTON HEALTH CENTER

*3300 N. 124th St., Door W-14 Wauwatosa, WI 53222*
(414) 778-6200
www.myquadmedical.com

## FIDELITY - 401(k) AND PENSION

*Service Center*
(800) 835-5095
401k.com

## BEST DOCTORS

*Support service to make informed medical decisions*
(888) 281-6550
bestdoctors.com/bhcg

## LIFE INSURANCE

*Prudential*
(800) 524-0542
prudential.com/mybenefits

## DELTA DENTAL

*Dental coverage and benefits, finding a network provider (Premier or PPO network available)*
(800) 236-3712
deltadentalwi.com

## DELTA VISION (EYEMED)

*Vision coverage and benefits, finding a network provider (EyeMed Access)*
(866) 723-0513
eyemedvisioncare.com

## NATIONAL BENEFITS CONSULTANTS

*Retiree Medigap and Medicare Supplement Options*
(800) 875-1505
www.retireemedical.com

## GOVERNMENT BENEFITS

*Social Security*
(800) 772-1213
ssa.gov

*Medicare*
(800) 633-4227
medicare.gov

## ✱ VISITING THE BRIGGS & STRATTON BENEFITS DEPARTMENT

*Although we understand that you may need to speak with us in person from time to time, we are no longer staffed to accept walk-in visitors. Before visiting, we ask that you first contact the Benefits Service Center (see top of page for contact information). If you still need to contact someone in the Benefits Department, it would be best to schedule an appointment. Should you stop in without an appointment, please understand that we may not be available to see you. You will be asked to leave a short message and phone number. Someone will call you back within one business day. Thank you for your understanding.*

## ✱ HELPFUL TIP

**Don't forget to make sure your provider is in-network before scheduling your next appointment!**

### About This *Benefits at a Glance*

This Benefits Summary provides a general overview of the benefit plans offered by Briggs & Stratton Corporation. It does not include all the details, limits or exclusions. If there is any discrepancy between the information in this Benefits Summary and the actual plan documents, plan amendments or insurance contracts, those documents will govern in all cases. While Briggs & Stratton Corporation hopes to continue the benefit plans, it reserves the right to amend or end any of its benefit plans, in whole or in part, at any time, with respect to any and all classes of employees, including retirees.

# EXHIBIT A



# 2016 OPEN ENROLLMENT
## October 26 to November 6, 2015

## ELIGIBLE FOR MEDICARE?

- Read the Important Information on Page 5 to learn about how Medicare eligibility impacts your medical plan.

# 2016 OPEN ENROLLMENT IS HERE
# OCTOBER 26 – NOVEMBER 6, 2015

It's time to select your 2016 Health & Welfare Benefits. This Benefit at a Glance gives an overview of your health care benefits. Please review before you make your 2016 elections.

## WHATS CHANGING FOR 2016

We are pleased to announce that our health plan administrator will be changing to UnitedHealthcare (UHC) effective January 1, 2016. The change to UHC will not require you to enroll in your current plan, as long as you wish to remain in the same medical plan design next year. Here is a quick summary of some of the changes and highlights:

- **New health plan administrator and provider network**
  UnitedHealthcare will administer our medical and prescription drug plans beginning in 2016. Contact UHC now to verify if your providers are in network and if you will need assistance with transition of care (previously approved surgeries, cancer treatment, etc.)

- **IRS announced a change to 2016 annual Health Savings Account (HSA) contribution maximums**
  $3,350 for single coverage and employee plus coverage increases to $6,750

- **Plan Designs** - No changes to the deductibles or out-of-pocket limits

- **Definition of spouse changing from opposite-sex legal spouse to legal spouse**
  Proof of marriage is required

## ENROLLING & MAKING CHANGES TO YOUR BENEFITS

In a separate mailing you will receive a pre-confirmation statement which shows your current health care benefit elections along with your new 2016 premium costs. If you have not received your statement or if you have any questions regarding this statement, you may contact the Benefits Service Center at (877) 232-1083.

## REASONS TO GO ONLINE OR CALL THE BENEFIT SERVICE CENTER:

Although we encourage everyone to go online to view their benefit options and costs for 2016, we have identified a listing of important reasons when you MUST actively enroll. Go online or call if you are:

- Changing medical, dental or vision plans
- Waiving coverage
- Adding or removing dependents
- Changing your life insurance beneficiary
- Providing (or updating) your personal email address for future electronic delivery of information

## WHAT HAPPENS IF YOU DON'T ENROLL?

It is always smart to make an active choice based on your needs. If you don't make an active elections:

- You will automatically be enrolled in the UHC medical and Delta Dental/Delta Vision plans at the levels of coverage you are enrolled in now. If you waive coverage now, your waived benefits will continue in 2016.

## ONLY LIMITED CHANGES ALLOWED DURING THE YEAR

Benefit decisions you make during the enrollment period, whether active elections or defaulted elections, will remain in effect for the entire calendar year unless you have a qualified life event, such as:

- Marriage
- Divorce
- Birth or Adoption of a child
- Death of your spouse or child
- Changes in your spouse's employment status
- Loss or Gain of coverage for you, your spouse, or eligible dependent

**IMPORTANT**
To change your benefit elections after a qualified life event, you must make the change online **within 30 days after the life event** occurs. If you miss the deadline, you must wait until the next open enrollment. For questions and assistance, contact the Benefits Service Center at 877.232.1083.

# RESOURCES TO KEEP YOU WELL ... AND HELP SAVE YOU MONEY AT THE SAME TIME!

Briggs & Stratton has provided **at no cost to you** several resources to help you manage your health care costs.

## PATIENT CARE

This patient care advocacy service offers confidential, free assistance to non-Medicare participants:

- Understanding your health benefits
- Researching health care costs and quality data
- Referrals and provider selection
- Resolving claim issues
- Negotiating billing with doctors and hospitals

## BEST DOCTORS

To be eligible for this service, you must be enrolled in a Briggs & Stratton medical plan. Best Doctors provides confidential, individualized support to you and your physician so that you can make the best possible decisions about your health care. This service will help you in gathering information to make informed decisions if you are:

- Unsure about your health situation
- Needing an expert opinion
- Wondering about your treatment options
- Needing to find a medical provider

For information regarding Patient Care and Best Doctors, visit the bswift website library.

## PROVIDER WEBSITES:

- If you haven't already, now is the perfect time to register for our provider websites. They contain a wealth of information to help you make more informed decisions from prescription costs to finding the right provider for you. UnitedHealthcare has online consumerism tools on their sites to help supplement the work that Patient Care can do.

## TOBACCO CESSATION:

- When you're ready to quit, we're ready to help. Eligible prescribed over-the-counter and prescription tobacco cessation aids are covered by our medical plan at 100%. We encourage you to contact Patient Care or UnitedHealthcare to verify that the cessation aid your doctor prescribes is covered by the medical plan.



# MEDICAL

| | High-Deductible PPO Plan (HDHP) | | Standard PPO Plan | |
|---|---|---|---|---|
| | In-network | Out-of-network | In-network | Out-of-network |
| Provider network | Humana Preferred (BHCG) | | | |
| Annual deductible | $2,600 Individual $5,200 Family | $6,000 Individual $12,000 Family | $500 Individual $1,000 Family | $1,000 Individual $2,000 Family |
| Annual out-of-pocket maximum | $5,500 Individual $11,000 Family | $11,000 Individual $22,000 Family | $5,500 Individual $11,000 Family | $11,000 Individual $22,000 Family |
| | *Includes coinsurance and deductible for medical and prescription expenses.* | | *Includes coinsurance and deductible for medical expenses only. Excludes copays and prescription expenses.* | |
| Annual maximum benefit | Unlimited | | Unlimited | |
| Lifetime maximum benefit | Unlimited | | Unlimited | |

## Medical, member pays

| | | | | |
|---|---|---|---|---|
| Plan coinsurance | 5% | 40% | 20% | 40% |
| Routine Preventive Care[1] | 0% | 100% | 0% | 100% |
| Office visits | After deductible, 5% | After deductible, 40% | 20%, no deductible | 40%, after deductible |
| Hospitalization[2] | After deductible, 5% | After deductible, 40% | After deductible, 20% | After deductible, 40% |
| Emergency room | After deductible, 5% | After deductible, 5% | $150 copay (waived if admitted), then after deductible, 20% | $150 copay (waived if admitted), then after deductible, 20% |
| | *If not a true emergency, stated coinsurance percentage will be reduced to 50%* | | | |
| Behavioral health or substance abuse | Behavioral health or substance abuse expenses are not subject to separate plan limitations. | | | |

[1] This benefit includes preventive screenings, colonoscopies, mammograms, and immunizations  [2] Some services may require pre-certification. Contact your medical insurance provider for more details.

| Rx, member pays | High-Deductible PPO Plan (HDHP) | | Standard PPO Plan | |
|---|---|---|---|---|
| | Retail network *(30-day supply)* | Mail-order or retail *(90-day supply)* | Retail network *(30-day supply)* | Mail-order or retail *(90-day supply)* |
| | **Preventive RX and Smoking Cessation products[3] will be paid in full, no deductible.** | | | |
| Tier 1 *(low-cost generics & brand names)* | After deductible, 20% | After deductible, 10% | No deductible, 20% | No deductible, 10% |
| Tier 2 *(high-cost generics & brand names)* | After deductible, 30% | After deductible, 20% | No deductible, 30% | No deductible, 20% |
| Tier 3 *(higher-cost, mostly brand names)* | After deductible, 40% | After deductible, 30% | No deductible, 40% | No deductible, 30% |
| Tier 4 *(high-technology drugs)* | After deductible, 25% up to $100 per prescription per month | | No deductible, 25% up to $100 per prescription per month | |
| Smoking Cessation | Retirees and dependents participating in our medical coverage are eligible for an enhanced smoking cessation benefit. Certain prescription (and prescribed over-the-counter) cessation aids are covered at 100% under our medical plans. | | | |

*Visit www.welcometouhc.com/briggs for detailed prescription plan information*

[3] The medications that appear on the list will vary by carrier, visit www.welcometouhc.com/briggs for additional information.

# MEDICARE PARTS A AND B

Briggs & Stratton Retiree Medical Plans require plan participants to enroll in Medicare Parts A and B when first eligible.

If you do not enroll in Medicare when first eligible, the plan will estimate Medicare's payment and will only consider the net difference, leaving the estimated Medicare payment as YOUR financial responsibility. In addition, you will also be responsible for any plan out-of-pocket expenses (such as deductible and coinsurance).

If you didn't sign up for Medicare Part B when you first became eligible, you may be able to sign up during the General Enrollment Period, which runs from January 1 through March 31 of each year.

**HOW TO SIGN UP FOR MEDICARE PART B**
- If you already have Medicare Part A and need Part B, you can sign up for Part B at your local Social Security office or by calling (800) 772-1213. TTY users should call (800) 325-0778.
- Additional information can be found online at http://www.medicare.gov/ or by calling your local Social Security office or by calling Medicare at (800) MEDICARE or (800) 633-4227). TTY users should call (877) 486-2048.

# MEDICARE PART D - CREDITABLE COVERAGE

If you are enrolled in the Standard or High-Deductible PPO plan and become eligible to enroll in a Medicare drug plan, there are two important things you need to know about your current coverage and Medicare's prescription drug coverage:

1. Medicare prescription drug coverage became available in 2006 to everyone with Medicare. You can get this coverage if you join a Medicare Prescription Drug Plan or join a Medicare Advantage Plan (like an HMO or PPO) that offers prescription drug coverage. All Medicare drug plans provide at least a standard level of coverage set by Medicare. Some plans may also offer more coverage for a higher monthly premium.

2. Briggs & Stratton has determined that the prescription drug coverage under the **Standard PPO and High Deductible PPO plans**, on average for all plan participants, are expected to pay out as much as or more than the standard Medicare prescription drug coverage pays and is therefore considered Creditable Coverage. Because this coverage is <u>Creditable Coverage</u>, participants can keep this coverage and not pay a higher premium (a penalty) if they later decide to join a Medicare drug plan.

(Not available to Disability Retirees)

# DENTAL

| | Delta Dental Basic | Delta Dental Preferred |
|---|---|---|
| Provider network | You may use any provider you wish, but your cost is lower if you use the Delta Dental network. | |
| **Annual deductible** *Applies to all services unless otherwise noted* | $25 individual, $75 family | $25 individual, $75 family |
| **Annual maximum benefit** | $1,250 per individual | $1,500 per individual[1] |
| **Dental, member pays** | | |
| **Preventive and diagnostic care**[1] | No deductible, 20% | Covered at 100% |
| **Basic restorative** *e.g. fillings, root canals, etc.* | After deductible, 50% | After deductible, 20% |
| **Major restorative** *e.g. crowns, bridges, etc.* | After deductible, 50% | After deductible, 50% |
| **Orthodontics** *e.g. braces* | After deductible, 50% up to lifetime maximum of $1,300 per person. Covered only for dependent children to age 26 | 50%, after deductible up to lifetime maximum of $1,500 per person. Covers employees, spouses and dependent children to age 26 |

[1] *Two preventive check-ups (exams, x-rays, and cleanings) per individual each year do not count toward the annual maximum benefit (not subject to deductible).*

# VISION

| | Delta Vision Basic (EyeMed) | | Delta Vision Preferred (EyeMed) | |
|---|---|---|---|---|
| Provider network | You may use any provider you wish, but you receive a greater discount if you choose a provider in the EyeMed network. | | | |
| **Vision, member pays** | | | | |
| | In-network | Out-of-network | In-network | Out-of-network |
| **Eye exam** *Once every 12 months* | Covered at 100% | Charges over $30 | Covered at 100% | Charges over $35 |
| **Eyeglasses** | 80% of charges over $50 | Charges over $50 | 80% of charges over $130 for frames; Basic lenses are paid in full[1] | Charges over $65 |
| | *Either eyeglass lenses or contacts are covered every 24 months; Frames covered every 24 months* | | *Either eyeglass lenses or contacts are covered every 12 months; Frames covered every 24 months* | |
| **Contact lenses** | 85% of charges over $50 | Charges over $50 | 85% of charges over $150 | Charges over $96 |
| | *Either eyeglass lenses or contacts covered every 24 months* | | *Either eyeglass lenses or contacts covered every 12 months* | |
| **Corrective surgery** | 85% of retail or 95% of promotional cost | Not covered | 85% of retail or 95% of promotional cost | Not covered |

[1] *Basic lenses are paid in full; however, additional charges will apply for add-ons such as anti-reflective coating, progressive lenses, and scratch coating.*

**Note:** *Frequency limits are calculated to the day. Example, if your last exam was on August 31, 2013, you wouldn't be eligible for another exam until August 31, 2014*

Case 2:10-cv-00700-LA    Filed 04/12/16    Page 45 of 49    Document 185-1

# LIFE INSURANCE

## Retiree life insurance (if eligible)

**Coverage Options**

If you are eligible for company-sponsored life insurance, the amount of **your life insurance coverage will be listed on your personalized confirmation statement. You will receive this statement before and after Open Enrollment**. Note: All life insurance claims are processed by the Briggs & Stratton Service Center.



### HAVE YOU UPDATED YOUR BENEFICIARIES LATELY?

If you have company-sponsored Life Insurance, it is important to ensure each year that your beneficiaries are up-to-date. If you don't go online or call during Open Enrollment to make changes, you can still easily verify beneficiary information on the confirmation statement you will receive in the mail after the close of Open Enrollment. If you need to make changes, call (877) 232-1083 or go online to http://basco.bswift.com.

## Pension Reminders

**Tax Withholding**

If you are receiving a Briggs & Stratton Pension Benefit, now is a great time to review your current state and federal tax withholding from your Pension check. To change your withholding, contact Fidelity.

**Direct Deposit**

Don't forget that Direct Deposit is the best way to ensure that you receive your Pension check on time every month. If you're interested in signing up, or you need to make any changes to your account or bank during the year, contact Fidelity.



## BENEFITS SERVICE CENTER POWERED BY BSWIFT

*Enrolling, contributions, ID cards, provider directories, family status changes, creditable coverage, life insurance claims and beneficiaries*

**http://basco.bswift.com**
(877) 232-1083
Available 7AM to 7PM CST, Monday through Friday

## PATIENT CARE

*Patient advocacy, assistance with choosing plans or providers, claim issue mediation and can provide cost or quality data for providers*

(866) 253-2273
patientcare4u.com

## UNITEDHEALTHCARE

*Advocate4Me team:*

(844) 634-1232
welcometouhc.com/briggs

## BRIGGS & STRATTON HEALTH CENTER

*3300 N. 124th St., Door W-14 Wauwatosa, WI 53222*

(414) 778-6200
www.myquadmedical.com

## FIDELITY - 401(k) AND PENSION

*Service Center*

(800) 835-5095
401k.com

## BEST DOCTORS

*Support service to make informed medical decisions*

(888) 281-6550
bestdoctors.com/bhcg

## LIFE INSURANCE

*Prudential*

(800) 524-0542
prudential.com/mybenefits

## DELTA DENTAL

*Dental coverage and benefits, finding a network provider (Premier or PPO network available)*

(800) 236-3712
deltadentalwi.com

## DELTA VISION (EYEMED)

*Vision coverage and benefits, finding a network provider (EyeMed Access)*

(866) 723-0513
eyemedvisioncare.com

## NATIONAL BENEFITS CONSULTANTS

*Retiree Medigap and Medicare Supplement Options*

(800) 875-1505
www.retireemedical.com

## GOVERNMENT BENEFITS

*Social Security*

(800) 772-1213
ssa.gov

*Medicare*

(800) 633-4227
medicare.gov

## ✳ VISITING THE BRIGGS & STRATTON BENEFITS DEPARTMENT

*Although we understand that you may need to speak with us in person from time to time, we are no longer staffed to accept walk-in visitors. Before visiting, we ask that you first contact the Benefits Service Center (see top of page for contact information). If you still need to contact someone in the Benefits Department, it would be best to schedule an appointment. Should you stop in without an appointment, please understand that we may not be available to see you. You will be asked to leave a short message and phone number. Someone will call you back within one business day. Thank you for your understanding.*

## ✳ HELPFUL TIP

**Don't forget to make sure your provider is in-network before scheduling your next appointment!**

**About This *Benefits at a Glance***

This Benefits Summary provides a general overview of the benefit plans offered by Briggs & Stratton Corporation. It does not include all the details, limits or exclusions. If there is any discrepancy between the information in this Benefits Summary and the actual plan documents, plan amendments or insurance contracts, those documents will govern in all cases. While Briggs & Stratton Corporation hopes to continue the benefit plans, it reserves the right to amend or end any of its benefit plans, in whole or in part, at any time, with respect to any and all classes of employees, including retirees.

# EXHIBIT B

**PREMIUM COST SHARING FOR SPECIAL EARLY RETIREES AFTER 10 YEARS**

**High Deductible Plan:**

|  | Employer Portion | Employee Portion |
|---|---|---|
| Retiree Only | $446.63 | $162.62 |
| Retiree and Spouse Under Age 65 | $894.72 | $445.65 |
| Retiree and Child | $894.72 | $124.12 |
| Family | $1,339.88 | $410.08 |
| Retiree and Spouse Over Age 65 | $765.93 | $0 |

**Standard PPO Plan:**

|  | Employer Portion | Employee Portion |
|---|---|---|
| Retiree Only | $434.46 | $240.03 |
| Retiree and Spouse Under Age 65 | $870.37 | $613.53 |
| Retiree and Child | $870.37 | $257.57 |
| Family | $1,303.38 | $633.97 |
| Retiree and Spouse Over Age 65 | $847.96 | $0 |

**EXHIBIT B**